UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA                    **MEMORANDUM & ORDER**
                                            16-CR-652 (DRH)

-against-


ANAEL SAINFIL,

                        Defendant.
--------------------------------------------------------X

**APPEARANCES:**

**For the Government:**
    Richard P. Donoghue
    United States Attorney
    Eastern District of New York
    100 Federal Plaza
    Central Islip, New York 11722
    By:    Mark E. Misorek, A.U.S.A.

**For Defendant:**
    Perini & Hoerger
    1770 Motor Parkway, Suite 300
    Islandia, New York 11749
    By:    Maureen Hoerger, Esq.


**HURLEY, Senior District Judge:**

On January 25, 2018, defendant Anael Sainfil[1] ("Sainfil" or "Defendant") was convicted

of one count of conspiracy to commit armed bank robbery, one count of armed bank robbery,

and one count of brandishing a firearm during a crime of violence. The purpose of this

Memorandum is to address Defendant's motion pursuant to Federal Rules of Criminal Procedure

29 and 33 for a judgment of acquittal or, in the alternative, for a new trial. In accordance with the

reasoning set forth below, both motions are denied.

---

[1] Sainfil is also known as "M" and is referred to as such in the trial testimony.

**BACKGROUND**

**I.    The Indictment**

The indictment charged Sainfil, Ovell Gahagen ("Gahagen"), Quincy Homere ("Homere"), and Marcus Wells ("Wells"), together with Vincent Bifolco, Jayshant Rose and Tasha Chance, with planning and then executing a robbery of the Wells Fargo Bank in Hempstead, New York (the "Bank") on November 9, 2015, using one or more firearms.

**II.    Summary of Trial Evidence**

The trial evidence, presented over two days, included the government calling nine witnesses, several of whom were co-conspirators. In brief, as presented by the government, between August 2015 and November 2015, Sainfil, along with his co-conspirators, including Homere, Wells, Gahagen, and Andrew McCarthy ("McCarthy"), planned and ultimately executed an armed robbery of the Bank. During the actual robbery, Sainfil and Gahagen were the lookouts, while Homere, Wells and two other armed men (Jayshant Rose and Yuseff Jackson) were dropped off at the Bank by McCarthy, the driver, and robbed it of $375,710.  The defense did not call any witnesses but presented a video taken from the Bank's surveillance cameras. The trial testimony is summarized in relevant part below.

**A.    The Planning of the Bank Robbery**

Tasha Chance ("Chance"), a coconspirator, was an employee at the Bank and became romantically involved with Homere, a customer. She learned he sometime slept at a music studio located in Hempstead (the "Studio"). She testified that on her first visit to the Studio, she was greeted at the door by Sainfil stating "You're the chick from the Bank."  Homere then introduced defendant stating "this is my boy M. He's my ride. I don't go anywhere without him. That's my

right hand man. It always me [and] him." Chance and Homere went on multiple dates over the next few weeks. (Tr. 317-24.)

In approximately July 2015, after Chance's employment at the Bank had been terminated, Homere contacted her stating he had an emergency. They met near the Studio and Homere explained he intended to rob the Bank but needed information from her to do so and gave her a disposable black phone to use to discuss the robbery. (Tr. 325-28.)

Thereafter, Homere called Chance and told her to meet him at the Studio. When she arrived, she was greeted by Defendant who led her to a bedroom in the rear of the studio, where Homere was already present. The three then began to discuss the robbery with the door closed, which discussion lasted for about one hour. According to Chance, Defendant stated, "If we're going to do this you got to do this right. We can't have any mistakes. Now I need you to walk me through who is working there, who has keys, who has codes." Continuing, Defendant questioned Chance regarding specific details about the day-to-day operations of the Bank, the number of drawers located in the rear of the Bank and step-by-step procedures regarding the vault. Chance testified that is was Defendant, not Homere, who did the questioning and who made specific reference to Bank employees, "Elias" and Shanequa Moon ("Moon"), a teller.

Defendant stated, as further reported by Chance, that he noticed that Bank employee Carlos Acevado ("Acevado") was no longer driving to work but rather taking the bus. Defendant also provided a detailed description of Moon's daily travel routine from the Bank after work until she arrived at her house. When Homere suggested a staged accident with Moon so she could be kidnapped for the night until the Bank opened in the morning, Defendant chimed in that if she resisted, a person could be "at the house with her dad" as "she is close to her dad and she wouldn't want anything to happen to [him]." (Tr. 328-332.)

The next day, Chance was again called to the Studio by Homere, where she once more discussed Bank details with him and Defendant for about one hour. Defendant questioned her regarding his observations that the Bank appeared to have new security guards and employees. When Chance lacked the information he sought, Defendant stated "We cannot miss a beat. We have to stay on track of who's there, how long it takes them to come in, and who is [sic] the new people that worked at the bank." (Tr. 333-34.)

McCarthy, whose role in the robbery was as a driver, testified that on two or three occasions in 2015 he saw Chance, Homere, and Defendant together at the studio where the three met behind closed doors, each time for about fifteen minutes. (Tr. 114-16; 333-334). According to Gahagen, whose role was look-out, he saw Chance come to the studio three to six times during the summer of 2015 and on at least on one occasion he saw Chance, Homere, and Defendant have a meeting at the Studio that lasted about 15 minutes. (Tr. 233-39.) Chance testified that Defendant was the leader of the robbery (Tr. 264), whereas the other testifying participants described Homere as the leader.

McCarthy also testified that during the summer of 2015, he was directed to follow Homere to a house in Roosevelt that Defendant was watching. Upon arrival at the house Homere approached Defendant's vehicle and the two had a brief conversation, after which Defendant left. Homere told McCarthy to surveil the house for any signs of movement, which he did for two hours and then left. On another occasion, Homere again told McCarthy to surveil the same house; McCarthy later learned that the surveillance was related to the robbery.[2] After the surveillance McCarthy and Defendant had a conversation in the Studio. In response to

---

[2] Wells, a co-defendant and government witness, testified that the first time he met Defendant was when he, Homere and Defendant conducted surveillance of the Bank prior to the robbery.

McCarthy's statement that when the robbery took place he did not want to be the one entering the Bank, Defendant stated "I'm not going into the [B]ank either. I'll, you know, I'll be a lookout. If anything goes wrong like being pulled over by the police, I'm only looking about spending a small amount of time, two or three years. I'm not going into the [B]ank." According to McCarthy, Defendant was also present at a meeting with Homere in which Homere detailed to McCarthy the drop-off and pick-up locations for the participants post robbery. (Tr. 117-125.)

### B.       The Aborted Attempt

Prior to the actual Bank robbery, Homere announced to Defendant, McCarthy and Gahagen that he was ready to rob the Bank. McCarthy then drove to pick-up Jackson and Wells and drove them to "Marcy's" house as previously planned. Once inside Marcy's house, McCarthy testified, he observed Defendant and others preparing for the robbery by donning black outfits, mask and gloves and arming themselves. After about an hour of preparation, Homere directed Defendant to "go looking in the parking lot and see if you see anybody walking, parking, sitting in their cars" and to call Homere and report his observations. Defendant left Marcy's house and fifteen minutes later Homere received a phone call. After finishing the call, Homere announced "[Defendant] says it's clear." All involved then left Marcy's and headed to the Bank. Upon arriving at the Bank, Homere, Jackson, McCarthy, Rose and Wells waited until Homere ultimately decided that it "didn't feel right," whereupon they aborted the mission and left the location. McCarthy did not see Defendant at the Bank. (Tr. 130-37.)

In contrast, Wells testified that he did not see Defendant at Marcy's house before the aborted robbery attempt. Moreover, when they left the house on that occasion, they first sat in the Burger King parking lot for 5-10 minutes then drove to the Bank parking lot, waiting there a while before leaving. According to Wells, Homere did not want to go in given the possibility of

people in the parking lot. Because they did not know if anyone was in the parking lot during the attempt, when the actual robbery took place on November 9, Defendant was there to make sure nobody was in the cars in the Bank's lot. (Tr. 189-98.)

### C. The Robbery

McCarthy testified that on November 9, 2015, Homere went to McCarthy's house and told him that he was to prepare to rob the Bank. After dressing all in black, McCarthy left his house and met up with Defendant, Homere and Gahagen on a nearby corner. Defendant left after a brief conversation and Homere, McCarthy and Gahagen drove to pick-up Jackson and Wells. Those five went to Marcy's house; when they arrived Defendant and Rose were already present. As before, the participants prepared to rob the Bank. According to McCarthy, Defendant was there and after everyone was ready, Homere sent Defendant to the Bank and told him to look in the back and make sure no one was in the parking lot and to call him in 10 or 15 minutes. (Tr. 137-39.) Gahagen left first to conduct surveillance of the Bank and Defendant was sent to conduct surveillance as well. A short time later, McCarthy transported Homere, Jackson, Rose, and Wells to the parking lot of the Bank. McCarthy said that after about five minutes he observed Defendant walk from the rear of the Bank through the "drive-through side of the [B]ank" wearing a hoodie and possibly an ear piece in his ear. Simultaneously, Homere was on a telephone and McCarthy heard him directing Defendant, by name, to look into specific cars near the Bank. As Homere instructed the Defendant, McCarthy recounted observing Defendant looking into the specific cars being described by Homere.[3] After Defendant surveilled four or five cars and walked past McCarthy's vehicle, Homere told McCarthy to pull in front of the

---

[3] Gahagen also testified he observed the defendant walking in front of the Bank just prior to the robbery.

Bank, at which time Homere, Jackson, Rose, and Wells exited the vehicle and entered the Bank. (Tr. 139-42.)

According to Wells, he knew Homere was on the phone with Defendant because Defendant was walking through the parking lot looking through cars. (Tr. 194-97.) Gahagen saw a man with a hoodie walk diagonally to the bank parking lot some 20-30 feet away; he believed it was Defendant as he recognized the hoodie as one that Defendant frequently wears (although he wasn't wearing the hoodie when Gahagen saw him at Marcy's), but he could not see the man's face. (Tr. 253-54.)

Upon entering the Bank, the four announced they were conducting a robbery. Homere brandished an AK-47 rifle, Jackson displayed a .357 revolver, and Rose and Wells displayed BB guns. Bank employee were directed to open safes and the ATM within the vault. One of the four told Moon that they knew she was "Shanequa Moon" and that she lived in Roosevelt. Ultimately, Rose and Wells zip-tied employees and customers, as well as an eight-year-old boy. The four men took over $375,000 cash from the Bank and exited through the rear where they entered a vehicle driven by McCarthy and fled the location. (Tr. 21-44, 142.)

### D.     Post Robbery Events

After leaving the Bank, Homere, Jackson, Rose, Wells, McCarthy and Gahagen met at a predetermined location a few blocks away. Homere, Jackson, and Rose fled in a BMW, McCarthy and Gahagen fled in a second car, and Wells fled in a third car. (Tr. 143-44, 199-200.)

Meanwhile, local law enforcement, having been notified of the robbery, began conducting surveillance and set up road blocks in the area. At approximately 6:15 the BMW was observed traveling westbound on the Southern State Parkway, driving against traffic along the exit ramp. The BMW was pursued by law enforcement until it stopped in front of Greenwood

Court, in West Hempstead. The three occupants fled on foot; while Homere and Rose escaped, Jackson was apprehended. A ski mask was recovered near the BMW; Jackson's DNA was later recovered from the ski mask. A search was conducted of the BMW, pursuant to a warrant, which recovered a bag of United States currency, a loaded AK-47, a second ski mask, a Bank GPS tracking device and Homere's cellphone. Homere's DNA was later recovered from the second mask. After his arrest, Jackson told law enforcement about a weapon he threw from the BMW during the pursuit; based on that conversation a loaded .357 revolver was recovered. (Tr. 49-54, 61-74.)

Later that evening Gahagen and McCarthy went back to the Studio and saw Defendant, who, according to McCarthy stated "I can't believe we did it" (Tr. 145-46; *cf.* Tr. 258-59 (testimony of Gahagen that, back at the Studio, Defendant said that Homere was probably "so excited" and "going crazy for the money").) Wells testified that the day after the robbery, Defendant and Homere visited Wells' at his home, explained that the police had taken the money and that no one was getting paid. Both Defendant and Homere threatened Wells that he should not tell on anyone as they knew where his kids lived. (Tr. 201-02.)

Defendant was arrested on December 21, 2016 by FBI Special Agent Derek Wonderland ("Wonderland"). He was placed in an FBI vehicle and transported by Wonderland and Detective Michael Soto ("Soto") to an FBI office. Wonderland testified that the following occurred:

> As we were transporting Mr. Sainfil to our office, he was asking questions about his situation. . . .I told him we would be talking more once we got to our office, that everything would be explained to him. . . .[When Sainfil] kept asking why he was being arrested. . . I told him we had an arrest warrant for him in relation to the Wells Fargo bank robbery. I guess it was a year prior to that point in November. And I told him we knew he was involved in the bank robbery. . . .[When] he said, you are saying I robbed a bank, as a question, . . . I said we know you were involved as a lookout while your friends were inside the bank you were outside. [Defendant responded] just because I was outside the bank doesn't mean I robbed it.

(Tr. at 297-98.)

After arriving at the FBI office Defendant was provided with a Miranda waiver form, which he initialed. He was briefly interviewed by Wonderland and Soto. Wonderland told Defendant, "[W]e know you were outside the bank acting as a lookout," to which Defendant shrugged and replied, "[I]t doesn't mean I robbed a bank." (Tr. 302.)

Introduced at trial was a chart created from data taken from Homere's cellphone showing November 9, 2015 communications on his phone, i.e. on the date of the robbery. Vincent Bifolco[4], Gahagen, and Wells each testified that they made certain of the calls listed in that chart. Gahagen also testified that while he knew Defendant's phone number on the date of the robbery, he could only presently recall that it started with area code "323," which he identified as a California area code and admitted that he thought Defendant once lived in California. (Tr. 203, 245-46.) Detective Gaertner testified as to various calls and texts to and from Homere's phone made or received on that date, including the following calls and texts to and from a 323 244 0061 number, which did not have any name associated with it: (1) a 2:35 call to the 323 number of 3 seconds; (2) a 16:06 call from the 323 number; (3) a 17:21 call to the 323 number of 31 seconds; (4) a 17:41 outgoing call to the 323 number for 21 seconds; (5) three texts starting at 17:44 with the 323 number; (6) a 17:55 call of 15 seconds; (6) a 17:59 incoming call from the 323 of 22 seconds.; and (7) a 18:30 incoming call from the 323 number with no time available. (Tr. 72-84.)

I.      **The Instant Motion**

The basis for Defendant's Rule 29 motion for judgment of acquittal is as follows:

---

[4]  According to the trial testimony, Homere paid Bifolco, a tow truck driver, $10,000 to monitor the encrypted radio transmissions of the police during the time of the robbery.

"[T]he government failed to prove his identity as one of the robbers, thus necessitating his acquittal of the indictment. The direct evidence of his guilt was so contradictory or weak that it could not sustain a conviction, and the corroborative and circumstantial evidence did not directly point to the defendant and exclude all others." (Def.'s Mem. at 27). His Rule 33 motion is premised on the argument that he suffered severe prejudice from the introduction of a certain video and from ineffective assistance of counsel. (*Id.* at 54-78.)

## APPLICABLE LAW

### I.     Rule 29(c) Motion for Judgment of Acquittal

Rule 29 provides in pertinent part that "the court . . . must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. of Crim. P. 29(a). In deciding a Rule 29 motion, a court is required to construe all the evidence and draw all inferences in favor of the government. *See United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991). As a result, "[t]he court may not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence." Mehler, Gleeson and James, *Federal Criminal Practice: A Second Circuit Handbook*, § 29-2 at 511 (Lexis Nexis, 12th Ed. 2012), and cases cited therein. For a movant to prevail, he or she must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir. 2001) (citation and internal quotation marks omitted).

### II.    Rule 33 Motion for a New Trial

Federal Rule of Criminal Procedure 33 provides in pertinent part:

> Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . . .

Fed. R. Crim. P. 33.

In deciding whether to grant a motion for a new trial under Rule 33, the test is "whether 'it would be a manifest injustice to let the guilty verdict stand.'" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting *United States v. Reed*, 875 F.2d 107, 114 (7th Cir. 1989)). Before ordering a new trial under Rule 33, a district court must find that there is "a real concern that an innocent person may have been convicted." *Id*.; *see also United States v. Morales*, 902 F.2d 604, 606 (7th Cir. 1990) (Posner, J.) (describing order of new trial as a response to "a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted"); *United States v. Thomas*, 894 F. Supp. 58, 63 (N.D.N.Y. 1995) (district court should only grant a new trial "when it 'concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred'") (quoting *United States v. Lincoln,* 630 F.2d 1313, 1319 (8th Cir. 1980)). A trial court's discretion under Rule 33 "should be exercised sparingly." *Sanchez,* 969 F.2d at 1414.

## DISCUSSION

### I.     The Rule 29 Motion

Defendant's Rule 29 motion is premised on inconsistencies in the testimony of the various government witness. Set forth below are some of the inconsistencies relied upon by Defendant:

1. McCarthy testified that Defendant was present for the attempted robbery, while Wells and Gahagen did not.
2. In Well's testimony, the attempt was called off because he spotted someone in the back of the bank, whereas in McCarthy's version it was called off because Homere saw someone in a car.
3. According to Wells, as result of someone being seen in a car during the attempt, Defendant was placed as a look out on the second attempt to make sure it did not happen again, while McCarthy gave the opposite story.
4. Two of the witnesses had to be prompted to say that Defendant was at Marcy's house.

5. McCarthy had Ovell still at Marcy's house when they left in contradiction to the phone records.
6. Regarding placing Defendant at the scene of the robbery, Gahagen saw man in a hoodie across a highway, McCarthy saw a figure checking cars with an ear piece and knew it was Defendant because Homere said his name before every command while Wells sitting right next to McCarty did not hear Defendant's name.
7. Chance testified that Defendant was the leader in contradiction to the other testifying participants in the robbery.

(Def.'s Mem. at 28-53.)

The inconsistencies in the testimony of government witness formed a large portion of the defense's closing argument and, as evidenced by the guilty verdict, that argument was rejected by the jury. As the Second Circuit has stated "Choices between competing inferences and assessments of witness credibility lie solely within the province of the jury. The jury is free to believe part, and to disbelieve part, of any given witness's testimony. Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of witnesses. . . . . These principles apply whether the evidence being reviewed is direct or circumstantial." *United States v. Praddy*, 725 F.3d 147, 152 (2d Cir. 2013) (citations, internal quotation marks, brackets and ellipses omitted). Where there are "conflicts in the testimony, [the court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. Persico*, 645 F.3d 85, 104-05 (2d Cir. 2011); *see United States v. Josephberg*, 562 F.3d 478, 487 (2d Cir. 2009) ("The assessment of witness credibility lies solely within the province of the jury . . . ."); *United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[W]hen reviewing the sufficiency of the evidence [courts] defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony.") (quotation marks and citations omitted).

In sum, the jury was free to accept or reject all or any part of any witness's testimony. S*ee United States v. Cassese*, 428 F.3d 92, 98–99 (2d Cir. 2005) (holding that it is "of critical

importance [that] the evidence . . .be viewed in its totality . . ., as each fact may gain color from others." (internal quotations and citations omitted)); *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008). Defendant argues that because of the variations in the witnesses' testimony, the only reasonable inference is that "[s]ome testimony was demonstrably a recent fabrication." (Def.'s Mem. at 53.) While some of the details provided by the witnesses vary from each other, it is not uncommon for recollections to differ, especially after the passage of time, and for different individuals to experience the same event differently. Even if a portion of a witness's testimony is found to be false, the jury need not reject all of that witness's testimony. As the Second Circuit stated in *United States v. Weinstein*, 452 F.2d 704 (2d Cir. 1971):

> The maxim "Falsus in uno, falsus in omnibus" has been well said to be itself "absolutely false as a maxim of life." 3A Wigmore, Evidence § 1008 at 982 (Chadbourn rev. 1970). The correct principle was stated by Judge Campbell more than a century ago: There has never been any positive rule of law which excluded evidence from consideration entirely, on account of the wilful falsehood of a witness as to some portions of his testimony. Such disregard of his oath is enough to justify the belief that the witness is capable of any amount of falsification, and to make it no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements. But when testimony is once before the jury, the weight and credibility of every portion of it is for them, and not for the Court to determine. *Knowles v. People*, 15 Mich. 408, 412 (1867).

452 F.2d 213-14.

Here, a jury could have simply believed McCarthy, whose testimony was sufficient to find guilt beyond a reasonable doubt. The following portions of McCarthy's testimony supports the conspiracy charge: during the summer of 2015 he relieved Defendant from his surveillance that was connected to the robbery; McCarthy had a discussion with Defendant wherein Defendant said he would be a lookout; and Defendant was present at a meeting with Homere in which Homere detailed the drop-off and pick-up locations for the participants; on the day of the attempted robbery, Defendant was at Marcy's house where he and others prepared for the

robbery by donning certain clothing and arming themselves; while at Marcy's house on the day of the attempt, Homere told Sainfil to "go looking in the parking lot and see if you see anybody walking, parking, sitting in their cars" and to call Homere and report his observations; fifteen minutes later, Homere received a telephone call and announced that "[Defendant] says it's clear. (Tr. 117-125; 130-37.)

In addition, the following testimony by McCarthy supports Defendant's conviction on the other two charges of which he was convicted: on the day of the robbery, when he, Homere and Gahagen arrived at Marcy's, Defendant was there and was sent by Homere to the Bank to look in the back and make sure no one was in the parking lot and to call him in 10 or 15 minutes. After McCarthy and the others arrived at the bank, Homere was on the phone with Defendant directing him by name to look into specific cars near the bank and McCarthy saw him looking into the specific cars being described by Homere; after Defendant surveilled four or five cars, Defendant walked past McCarthy's vehicle; later that evening, when McCarthy saw Defendant back at the studio, Defendant said "I can't believe we did it." (Tr. 139-146.) *Cf. United States v. Riggi*, 541 F.3d 94, 110 (2d Cir. 2008) ("[A] conviction may be supported only by the uncorroborated testimony of a single accomplice . . . if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.") (internal quotation marks omitted).

Moreover, Chance, Gahagen, McCarthy and Wells all testified that Defendant was an active participant in the planning of the robbery and there is additional testimony placing Defendant at the scene as a look-out. The testimony in this case was corroborated by the cell phone evidence retrieved from Homere's phone, as well as Defendant's admission to Agent Wonderland that he was present in front of the Bank during the robbery.

Defendant's reliance on *United States v. Monsalvatage,* 689 F. App'x 680 (2d Cir. May 4, 2017) is misplaced. In that case, the government relied upon surveillance video, interpreted by law enforcement witnesses, buttressed by inconclusive phone records to support its theory that defendant Dunkley was "robber number 1." Here, in contrast, there was testimony by co-conspirators identifying Defendant as a look-out for the robbery.

Defendant's Rule 29 motion is denied.

### B.      The Rule 33 Motion

Defendant's asserts two principle bases for his Rule 33 motion: the introduction of videotape evidence at trial and his counsel's failure to move to suppress his statements to Agent Wonderland. The Court will first address the introduction of the video tape.

By way of background, toward of the close of its case, the government introduced a 13 second video from a Bank surveillance camera of a man on a cell phone walking through the outside ATM area of the Bank and thus purporting to show Defendant outside the Bank acting as a lookout five minutes before the robbery. As part of his defense, Defendant put together a composite video which "demonstrated without question" that the figure in the surveillance video was a bank patron who did not match Defendant's racial make-up. (Def.'s Mem. at 61.) Defendant's video was shown the day after the government's but, according to Defendant, there was "not sufficient time to get a witness to present it, to link it into a diagram of the bank, or to give an effective narrative of what the jury was seeing." (Def.'s Mem. at 55-56.)[5] Nor did defense counsel move for a mistrial based on the government's presentation of its video, move to

---

[5] In support of his motion, Defendant belatedly submitted a revised video which he asserts "more clearly illustrates" that the individual in the government's video was not him. (*See* Def.'s Mar. 28, 2019 Supp. Letter Motion (DE 191).)

have it stricken or ask for a curative instruction. (*Id*. at 56.) In its summation, the government conceded that its video was of limited value. (Tr. at 390.)

In this case there was testimony from numerous witnesses as to Defendant's participation in the planning of the robbery as well as his participation as a look-out. With respect to Defendant acting as a look-out, McCarthy testified that he observed Defendant walk from the rear of the Bank through the "drive-through side of the [B]ank" wearing a hoodie and possibly an ear piece in his ear. Simultaneously, Homere was on a telephone directing Defendant, *by name*, to look into specific cars near the Bank. As Homere instructed the Defendant, McCarthy and Wells each observed Defendant looking into the specific cars being described by Homere. After Defendant surveilled four or five cars and walked past McCarthy's vehicle, Homere told McCarthy to pull in front of the Bank, at which time the other four occupants exited the vehicle and entered the bank. Given the testimonial evidence, including that which placed Defendant at the Bank, and Defendant's statements to Detective Wonderland, the Court cannot conclude that there is a real concern that innocent person may have been convicted.

Nor was the government's introduction of the video so prejudicial as to require a new trial. Here, the government conceded to the jury in its rebuttal summation that the government's video evidence was of very limited value (*See* Tr. at 390 ("And the video is what it is. If you only had the video in this case we wouldn't be here. Right? But all the other evidence shows you he was there").) More importantly, Defendant's trial counsel emphasized the inconsistencies in the testimony of the various cooperators, the lack of any testimony that the phone with the 323 area code was Defendant's and that the video presented by Defendant proved that the person in the video shown by the government was not Defendant. Having heard those arguments, the jury nonetheless convicted Defendant and this Court will not "invade the fact-finding province of the

jury to set aside the verdict." *United States v. Mercedes*, 771 F. App'x 73, 74 (2d Cir. June 21, 2019).

While Defendant maintains that the identification testimony of co-conspirators was "weak" rendering the introduction of the government's video "grossly prejudicial" (Def.'s Mem. at 64), the Court does not agree. The testimony in this case was neither "patently incredible" nor did it defy "physical realities" so as to constitute "exceptional" circumstances warranting relief; "problematic testimony does not automatically meet this standard." *United States v. McCourty*, 562 F.3d 458, 476 (2d Cir. 2009). McCarthy testified that he heard Homere refer to Defendant by name and saw him look into the various cars as directed by Homere before walking by the car he (McCarthy) was driving. That his testimony that he saw Defendant walking through the Bank's drive-through before looking at the cars as directed by Homere was not corroborated by the video is something the jury could consider in evaluating McCarthy's testimony, but it does not require its rejection. Indeed, it appears from the aerial photograph of the Bank with the locations of the video cameras marked thereon, submitted by Defendant in support of this motion (Ex. D to Def.'s March 28, 2019 Supp. Letter Motion (DE 191)), that the cameras would not necessarily capture an individual walking around the back parking lot or even an individual coming "around the back through the drive-through *side* of the bank." (Tr. at 140 (emphasis added).)[6] In any event, the introduction of the government's video opened the door for Defendant to play a video for the jury demonstrating that the individual in the government's video did not match Defendant's make-up, bolstering the defense argument that the jury should reject the co-conspirators' testimony. Thus, the issue was fairly framed for the jury's consideration on the ground advanced. A new trial is not required.

---

[6] The video clip submitted by Defendant shows the Bank patron passing through the drive-through, but as the aerial photo shows, one could walk along the westerly side of the drive-through without walking through it.

The Court now turns to the argument that defense counsel was ineffective because he failed to move to suppress Defendant's statement to Agent Wonderland. Defendant does not challenge the propriety of Wonderland responding to Defendant's question as to why he was being arrested in so far as Wonderland stated that Defendant was being arrested for the Wells Fargo bank robbery. However, Defendant maintains that by continuing on to state that "you were involved as a lookout while your friends were inside the bank you were outside," Wonderland engaged in the functional equivalent of interrogation under the standard set forth in *Rhode Island v. Innis*, 446 U.S. 291 (1980) without informing him of his *Miranda* rights. (Def.'s Mem. at 68.) Under *Innis*, the term interrogation includes express questioning of suspects, as well as its functional equivalent, i.e. "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301.

It is well settled that a motion under Rule 33 can be asserted for ineffective assistance of trial counsel. *See United States v. Brown*, 623 F.3d 104, 113 n. 5 (2d Cir. 2010) ("[W]e hold that the proper procedural avenue for defendant who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33."). To prove such ineffective assistance, a defendant must show: (1) "that counsel's representation fell below an objective standard of reasonableness"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Pham v. United States*, 317 F.3d 178, 182 (2d Cir.2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

When evaluating counsel's performance, judicial scrutiny must be highly deferential and must not serve as an opportunity to act as a Monday morning quarterback. *See Strickland*, 466

U.S. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound [ ] strategy.' " *Id*. (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). A defendant claiming ineffective assistance "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

To establish *Strickland* prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

Here, the failure to make a suppression motion does not meet either prong of the *Strickland* standard.

First, as argued by the government, embracing the post arrest statements was a sound strategy and comported with Defendant's theory of the case, i.e. that he was merely present at the Bank. "This strategy allowed the Defendant's theory of the case to be placed before the trial jury without being subject to cross-examination." (Gov't's Oct. 1, 2018 Letter (DE 176) at 2.) That this was a sound strategy is bolstered by the fact that it appears such a motion would have had little chance of success as that it does not appear that that Defendant was subject to the functional equivalent of interrogation. There is nothing improper with a police officer either responding to a question of "why am I here," or, even if unsolicited, accurately informing an arrestee of the charges against him or her. *See Acosta v. Artuz*, 575 F.3d 177, 191 (2d Cir. 2009) ("[T]he *Innis*

definition of interrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges). *United States v. Colter*, 2016 WL 3562053 *3 (June 24, 2016) (holding there was no functional equivalent of interrogation requiring suppression of non-Mirandized arrestee's statements made after he asked why he was being arrested and police told him it was "for a gun."). If law enforcement were trying to trick this Defendant into making incriminating statements, one would expect some additional questioning or statements from them after Defendant stated that being outside the bank did not make him a robber. Defendant does not contend that any such additional discourse occurred. *See generally United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992) (in determining whether interrogation or its functional equivalent occurred, the Court must consider "the totality of the circumstances of the agents' conduct.").

Second, there is no prejudice given Defendant's post-*Miranda* statement. The decision in *Oregon v. Elstad*, 470 U.S. 298 (1985), is instructive in this regard. "*Elstad* involved a situation in which a suspect made a [pre-Miranda] self-incriminating statement while two police officers were at his home investigating a robbery." *United States v. Capers*, 627 F.3d 470, 474 (2d Cir. 2010). "The officers transported the suspect to a police station where they gave him a Miranda warning prior to obtaining both an oral and written confession." *Id*. "[When] the defendant moved to suppress the postwarning confessions ... [t]he Supreme Court ... held that '[t]hough Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.' " *Id*. (quoting *Elstad*, 470 U.S. at 309). Finding that "the police did not employ any coercive tactics to elicit either confession and that the defendant made his postwarning confession voluntarily ... [t]he Court concluded that 'the dictates of *Miranda* and the

goals of the Fifth Amendment proscription against use of compelled testimony [were] fully satisfied in the circumstances of th[e] case.' " *Id*. at 475–76 (quoting *Elstad*, 470 U.S. at 318.) Here, given the absence of any claim that law enforcement engaged in a two-step deliberate interrogation technique which would warrant suppression of Defendant's second statement, *see generally United States v. Moore*, 670 F.3d 222 (2d Cir. 2012), the failure to move to suppress the statement made while Defendant was being transported, in view of the totality of the evidence, is not sufficient to undermine the confidence in the outcome of Defendant's trial.

Defendant raises a number of other decisions made by his trial counsel in support of his ineffective assistance claim, many of which constitute criticism of counsel's cross- examination. But second guessing the tactical and strategic choices made by counsel is seldom appropriate. Where, as here, counsel was actively engaged throughout the proceedings, cross-examined witnesses, made a cogent opening and sound closing argument, ineffective assistance of counsel is rarely found. *See, e.g., Caimite v. Fischer*, 2009 WL 236917, at *5–6 (E.D.N.Y. Feb. 2, 2009). It is also noteworthy that the claim regarding counsel's failure to object to the admissibility of the testimony regarding the aborted attempt does not meet the first prong of *Strickland* as that evidence was admissible in support of the conspiracy charge.

The one decision that is worthy of further mention is the failure to move for a mistrial after the government's introduction of the video referenced above.  It appears that decision not to move for a mistrial was driven in large part by the video evidence offered by the Defendant which demonstrated that the person in the government's video was not a person fitting Defendant's description. Such strategic choice to attempt to cast a pall over the government's entire case by submitting such a video and not moving for a mistrial, falls within the range of reasonable professional assistance.

Having considered all of Defendant's contentions in support of his motion for a new trial, both individually and collectively, the motion for a new trial is denied.

## CONCLUSION

Defendant's motion pursuant to Federal Rules of Criminal Procedure 29 and 33 is denied.

Dated: Central Islip, New York
      October 2, 2019                            <u>s/  Denis R. Hurley</u>
                                            Denis R. Hurley
                                            United States District Judge