**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Anael Sainfil, | | |
| | Petitioner, | |
| -v- | | 2:16-cr-652-3 (NJC) |
| | | 2:23-cv-8802 (NJC) |
| United States of America | | |
| | Respondent. | |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

This Opinion and Order addresses a petition for a writ of habeas corpus (the "Petition") filed by pro se Petitioner Anael Sainfil pursuant to 28 U.S.C. § 2255 seeking to vacate his conviction and sentence. (*See* Pet., ECF No. 318; Mem. Supp., ECF No. 319.) Sainfil argues: (1) that the district court erred in applying to the calculation of his advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G.") a two-level sentencing enhancement under U.S.S.G. § 3C1.2 for creating a substantial risk of death or serious bodily injury to others while fleeing from law enforcement; (2) that his appellate counsel was ineffective for failing to raise the issue of the incorrect application of U.S.S.G. § 3C1.2 on appeal from his conviction and sentence to the Second Circuit; (3) that he was also denied effective assistance of counsel by various acts and omissions of his appellate and trial counsel; and (4) that he was subjected to multiple instances of prosecutorial misconduct. (Pet. at 4–8; Mem. Supp.) Sainfil requests an

evidentiary hearing on his claims. (Mem. Supp. at 1–25; Reply at 1–17.) Respondents oppose the claims made in the Petition. (Mem. Opp'n, ECF No. 323.)

Based on a close review of the parties' submissions, this Court has determined that Sainfil's claims do not warrant an evidentiary hearing. Nevertheless, in an exercise of discretion, this Court ordered Sainfil's appellate counsel to respond to the claim that he provided Sainfil ineffective assistance on appeal by failing to raise the district court's error in applying the U.S.S.G. § 3C1.2 sentencing enhancement when determining Sainfil's sentence. (July 25, 2024 Order.)

For the reasons set forth below, Sainfil's appellate counsel was ineffective in failing to raise on appeal the district court's erroneous application of the two-level sentencing enhancement under U.S.S.G. § 3C1.2 for reckless endangerment of the lives of others when calculating the advisory Sentencing Guidelines range for Sainfil's offenses of conspiracy to commit armed bank robbery and armed bank robbery. Accordingly, the case is remanded for resentencing consistent with this Opinion and Order. The Court also appoints counsel to represent Sainfil for the purposes of a resentencing hearing. However, Sainfil's remaining arguments in support of habeas relief are denied for the reasons explained below.

**BACKGROUND**

The Court reviews the background of the case as necessary to address Sainfil's claims. In January 2018, the Honorable Leonard D. Wexler presided over the three-day jury trial at the conclusion of which a jury convicted Sainfil on three counts: (1) conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371; (2) armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d); and (3) brandishing a firearm during a crime of violence in violation of 18

U.S.C. § 924(c)(1)(A)(ii).[1] After Judge Wexler's passing in March 2018, the case was reassigned to the Honorable Denis R. Hurley, who presided over the post-trial motions and sentencing. (*See* Elec. Order, Apr. 4, 2018.) On November 30, 2023, this case was reassigned to the undersigned. (Elec. Order, Nov. 30, 2023.)

## I.    Sainfil's Trial

On December 20, 2016, a grand jury indicted Sainfil, alongside his co-conspirators, in connection with the November 9, 2015 armed robbery of a Wells Fargo Bank (the "bank") in Hempstead, New York. (Indictment, ECF No. 4.) A Superseding Indictment indicted additional co-conspirators. (Superseding Indictment, ECF No. 45.) The government alleged—and later presented evidence at trial showing—that Sainfil and his co-defendants, Ovell Gahagen, Quincy Homere, and Marcus Wells, conspired with multiple other individuals, including Jayshant Rose, Yusuf Jackson, Andrew McCarthy, Vincent Bifolco, and Tasha Chance, to rob the bank. *See United States v. Gahagen*, 44 F.4th 99, 102–04 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1069 (2023). The Indictment and Superseding Indictment charged Sainfil with conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371, armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d), and brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). (*Id.*; Superseding Indictment at 3–4.) Regarding the conspiracy count, the government alleged that Sainfil served as a lookout outside the bank while his armed co-conspirators entered the bank and took the money. (Superseding Indictment at 2.) The armed robbery and firearm brandishing counts charged Sainfil with aiding and abetting under 18 U.S.C.

---

[1] The jury trial took place from January 23 through January 25, 2018. The trial transcripts are available on the docket (ECF Nos. 135–37), and will be referenced throughout as "Trial Tr."

§ 2. (*Id.* at 3–4.) After his arrest, Sainfil pleaded not guilty, proceeded to trial, and at trial was represented by Glenn A. Obedin, Esq.

The government's theory at trial was that Sainfil and his co-conspirators planned the robbery over the course of multiple months from August 2015 to November 2015, staged an aborted attempt to rob the bank in October 2015, and finally executed the robbery in November 2015. (Trial Tr. at 9–15); *see Gahagen*, 44 F.4th at 102. At trial, the government offered the testimony of nine witnesses, including three cooperating co-conspirators, and multiple exhibits, including Homere's bank and phone records and surveillance video recordings from outside and inside of the bank. *See Gahagen*, 44 F.4th at 102. With respect to the latter, the government argued that the surveillance video from the parking lot outside the bank depicted Sainfil acting as a lookout. (Trial Tr. at 367–69.) Sainfil did not testify at trial. The defense introduced a single composite video from the bank's surveillance system, which, defense counsel used to argue that Sainfil was not depicted in the video recordings offered by the government. (*Id.* at 381–83.)

A. Robbery Preparation

Chance, a former employee at the bank, testified at trial that, during her romantic involvement with Homere, she met with him and Sainfil on two occasions. (Trial Tr. at 318–21, 326–29.) On the first occasion, Chance and the two men spent about an hour talking behind the closed door in Homere's music studio, and Sainfil discussed plans for the robbery. (*Id.* at 328–29.) Chance testified that Sainfil told her and Homere, "If we're going to do this you got to do this right. We can't have any mistakes. Now I need you to walk me through who is working

there, who has keys, who has codes." (*Id.* at 329–30.)[2] According to Chance, Sainfil asked her about the bank's vault and the daily procedures and operations at the bank. (*Id.* at 330.) She further described the conversations that Homere and Sainfil had about specific bank employees and the possibility of staging a fake car accident and kidnapping a bank teller the night before the robbery. (*Id.* at 332.) Sainfil suggested that they could use the teller's connection to her father to influence her: "[S]omebody will be at the house with [the teller's] dad. So [the teller] won't resist because [the teller] is close with [the] dad and [the teller] wouldn't want anything to happen to [the] dad." (*Id.* at 332.)

On the second occasion, Chance met Sainfil and Homere again at the latter's studio, where Sainfil questioned her about new security guards whom he had noticed at the bank. (*Id.* at 333.) Chance recalled that Sainfil told her, "We cannot miss a beat. We have to stay on track of who's there, how long it takes them to come in, and who is the new people that worked at the bank." (*Id.*)

Chance's account of Sainfil's participation in the planning of the robbery was corroborated by the testimony of co-conspirators. Specifically, McCarthy recounted witnessing Sainfil, Homere, and Chance having meetings behind closed doors in Homere's studio on two or three occasions in 2015. (*Id.* at 116.) Gahagen too recounted at least one meeting between Sainfil, Chance, and Homere in the summer of 2015. (*Id.* at 235.)

McCarthy, who was a getaway driver, testified that he and Sainfil both did not plan to be inside the bank at the time of the robbery with Sainfil saying, "I'm not going into the bank either

---

[2] Excerpts from Sainfil's filings and trial transcripts have been reproduced here exactly as they appear in the original. Errors in spelling, punctuation, and grammar have not been corrected or noted.

. . . I'll be a lookout. If anything goes wrong like being pulled over by the police, I'm only looking about spending a small amount of time, two or three years. I'm not going into the bank." (*Id.* at 125.)

B. Aborted Robbery Attempt

In October 2015, Homere told Sainfil, McCarthy, and Gahagen that he was ready to rob the bank. (*Id.* at 129–32.) The group, which included Wells and Jackson in addition to Sainfil, McCarthy, Gahagen, and Homere, met at the house of a woman named Marcy. (*Id.* at 129–30.) From there, Homere "sent [Sainfil] to the bank to scope the parking lot to mean to see if everybody is out of the parking lot." (*Id.* at 130.) Sainfil was supposed "to go look in the parking lot and see anybody walking, parking, sitting in their cars" and then, call Homere. (*Id.* at 133.) Fifteen minutes after Sainfil left Marcy's house, he called Homere, who then announced that "[Sainfil] says it's clear." (*Id.* at 133–34.) The co-conspirators left the house and drove, armed with guns, to the bank. (*Id.* at 134.) After arriving at the bank but before entering it, "[Homere had] seen something that wasn't right and he said no, its not right. We're not going in," and they left the bank going back to Marcy's house. (*Id.* at 135–37.)

C. November 9, 2015 Robbery

On November 9, 2015, McCarthy, Homere, Gahagen, Wells, Jackson, Rose, and Sainfil met at Marcy's house. (*Id.* at 139.) From there, Homere sent Sainfil to the bank, telling him, "[G]o look at the back, make sure nobody is in the parking lot, call me in 10 or 15 minutes." (*Id.*) In approximately 10 minutes, after looking at his phone, Homere announced, "It's clear, lets go." (*Id.*) McCarthy drove Homere, Jackson, Rose and Wells to the bank's parking lot, where they waited. (*Id.* at 140.) "[F]ive to seven minutes later [Sainfil] came around to the back through the drive-through side of the bank walking in with a hoodie on" and possibly "an earpiece in his

6

ear." (*Id.* at 140–41.) Over the phone, addressing Sainfil by name, Homere directed him to look into cars. (*Id.* at 141.) McCarthy testified that Sainfil looked into four or five cars identified by Homere and then walked around the car where McCarthy and other co-conspirators were sitting.[3] (*Id.* at 141–42.) Homere, Jackson, Rose, and Wells exited the car and went inside the bank armed with guns. (*Id.* at 142.)

Wells and a bank teller testified about the events that transpired inside the bank. After entering the bank, Homere brandished an AK-47, Jackson displayed a .357 revolver, and Rose and Wells displayed BB guns. (*Id.* at 28–29, 177–78.) A bank teller testified that one of them told her, "I know who you are," called her by her name and said that "he knew where [she] live[d]." (*Id.* at 28–29.) A bank employee grabbed a bag with money, placed a GPS tracker in it, and handed it over to the robbers. (*Id.* at 41.) A surveillance videotape from the bank depicting the robbery was played to the jury. (Gov't Ex. 25.)

After the co-conspirators left through the back of the bank with the bag of money—and unbeknownst to them, a GPS tracker, McCarty picked up the co-conspirators. (Trial Tr. at 142.) Sainfil was not with them. (*Id.* at 142–44.) Shortly thereafter, after meeting with Gahagen, they split up: Homere, Jackson, and Rose drove off in one car, Wells took another car, while McCarthy drove off with Gahagen in a third car. (*Id.* at 143–44.)

The bag of money with the GPS tracker was in the car with Homere, Jackson, and Rose. (*See id.* at 52–55, 64.) After police noticed that the car drove against traffic and at a high rate of speed, a brief pursuit ensued. (*Id.* at 53–54.) Homere, Jackson, and Rose abandoned the car and

---

[3] Gahagen also described seeing someone whom he believed to be Sainfil near the bank acting as a lookout. (Trial Tr. at 253–54.)

fled on foot. Homere and Rose escaped, but Jackson was apprehended. (*Id.* at 55.) The police searched the car pursuant to a warrant and recovered a bag of cash, a loaded AK-47, a ski mask, Homere's cell phone, and the GPS tracking device. (*Id.* at 69–70, 287–89.) Homere's DNA was later found on the ski mask in the car, and Jackson's DNA was found on a second mask found near the car. (*Id.* at 287–89.) After Jackson's arrest, law enforcement retrieved a loaded gun that he had discarded while fleeing. (*Id.* at 71.)

McCarthy and Gahagen, having fled in a different car, made it back to Homere's studio. (*Id.* at 145–46.) Sainfil greeted them there, exclaiming, "[W]e did it. I can't believe we did it." (*Id.* at 146.)

After the robbery, Homere mentioned to McCarthy that he left his cellphone in the getaway car. (*Id.* at 146, 171.) Homere and Sainfil also threatened Wells and his children after it became clear that law enforcement had recovered the stolen money. (*Id.* at 202.)

D.  Sainfil's Arrest and Statements to the FBI

A grand jury indicted Sainfil on December 20, 2016, and Derek Wonderland, a special agent with the Federal Bureau of Investigation ("FBI"), arrested him the following day. (Indictment; *see* Trial Tr. at 294.) Wonderland testified at trial about the arrest, specifically stating that after he arrested Sainfil, but before he read Sainfil his *Miranda* rights, Sainfil was in a car and "asking questions about his situation," including "why he was being arrested." (Trial Tr. at 297.) Wonderland testified that he had the following conversation with Sainfil:

> A.  I did. I told him we had an arrest warrant for him in relation to the Wells Fargo Bank robbery. I guess it was a year prior to that point in November. And I told him we knew he was involved in the bank robbery.
>
> Q.  Did he respond?

A.  He did. He said, you are saying I robbed a bank, as a question, and I responded that as well. I said, we know you were involved as a lookout while your friends were inside the bank you were outside.

Q.  Did he respond?

A.  He said, just because I was outside the bank doesn't mean I robbed it.

(*Id.* at 297:21–298:9.)

After arriving at the FBI field office, Sainfil was informed of his *Miranda* rights and provided with an acknowledgement form. (*Id.* at 300–01.) Sainfil initialed the form to indicate that he understood his *Miranda* rights. (*Id.*) Then Wonderland interviewed Sainfil:

A.  I said we knew you were outside the bank acting as a lookout. And he kind of gave me a shrug and said it doesn't mean I robbed a bank.

Q.  At this point did he say anything?

A.  At this point he said he wanted to stop questioning, stop talking about it and he wanted to talk to a lawyer.

Q.  At this point did you cease all questioning?

A.  Yes.

(*Id.* at 302:8–16.)

Defense counsel did not challenge the admissibility at trial of either statement by Sainfil. However, Obedin cross-examined Wonderland about the fact that his notes, which were turned over to the defense and used by Obedin to refresh Wonderland's recollection, stated that, after Sainfil was advised of his *Miranda* rights and signed the form, he "declined to speak further without a lawyer present." (*Id.* at 309–10.) Wonderland explained that he did not write the second—post-*Miranda*—statement down. (*Id.* at 311.)

9

E.   Admission of the Surveillance Video Evidence

During its case-in-chief, the government offered in evidence excerpts from the bank surveillance video, which showed a person—who, the government insinuated, was Sainfil—walking through the area outside the bank, using a cellphone and heading towards the parking lot. (Gov't Ex. 13; Trial Tr. at 291, 382.)

After the government rested, the defense entered in evidence an exhibit containing a composite of other bank surveillance footage, (Def. Ex. C; Trial Tr. at 367–69), arguing that neither the composite nor the government's video depicted Sainfil. (*Id.* at 381–83.) The government, in its rebuttal closing, addressed the conflicting evidence: "[T]he video is what it is. If you only had the video in this case we wouldn't be here, right?" (*Id.* at 390.)

The jury found Sainfil guilty on all three counts: (1) conspiracy to commit armed bank robbery in violation of 18 U.S.C. § 371; (2) armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d); and (3) brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii). (ECF No. 133.)

## II.   Rule 29 / Rule 33 Motions

After the verdict, Sainfil expressed dissatisfaction with Obedin's representation and asked the court to appoint him new counsel. (ECF No. 142.) Judge Hurley appointed Maureen S. Hoerger, Esq. to represent Sainfil. (ECF No. 144.) Sainfil, through Hoerger, moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, alternatively, for a new trial under Rule 33. (ECF No. 167.) While the Rule 29 motion mostly highlighted alleged inconsistencies in the testimony of the government's witnesses, the Rule 33 motion alleged ineffective assistance of counsel by Obedin, specifically based on his failure (1) to object to the

10

introduction of the bank surveillance video recording at trial, and (2) to move to suppress Sainfil's pre-*Miranda* statements to the FBI. (ECF No. 167.)

On October 2, 2019, Judge Hurley denied both motions. (Oct. 2, 2019 Order, ECF No. 204.) With regard to the sufficiency of the evidence and the alleged inconsistencies raised in the Rule 29 motion, he found that defense counsel had raised these issues at trial, and the jury had rejected them. (*Id.* at 12.) As to the Rule 33 motion, Judge Hurley determined that a new trial was not warranted because, in light of the testimonial evidence of Sainfil's guilt, the introduction of the bank surveillance video recording did not create a "real concern that [an] innocent person may have been convicted." (*Id.* at 16.) He also did not find any prejudice in the introduction of the video, noting that the government later "conceded that [the] video was of limited value" (*id.*; *see* Trial Tr. at 390), and that the jury heard testimony from multiple witnesses who directly connected Sainfil to the robbery and testified about his role as a lookout. (Oct. 2, 2019 Order at 16.) Judge Hurley noted that defense counsel "emphasized the inconsistencies in the testimony of the various cooperating witnesses, the lack of any testimony that the phone with the 323 area code[4] was [Sainfil's] and that the video presented by [Sainfil] proved that the person in the video shown by the government was not [Sainfil]." (*Id.* at 16.) Furthermore, Judge Hurley noted that "the introduction of the government's video opened the door for [defense] to play a video for the jury demonstrating that the individual in the government's video did not match [Sainfil's] make-up, bolstering the defense argument that the jury should reject the co-conspirators' testimony."

---

[4] At trial, the government offered in evidence Homere's phone records, which included communications with another phone number with a 323 area code (Gov't Ex. 16; Trial Tr. at 78–84), and Gahagen testified that he recalled that Sainfil had a phone number with the same area code (Trial Tr. at 245).

11

(*Id.* at 17.) Based on these reasons, Judge Hurley concluded that "the issue was fairly framed for the jury's consideration on the grounds advanced." (*Id.*)

With regard to the ineffective assistance of counsel claim, Judge Hurley found that no new trial was warranted because Sainfil's claims failed on both *Strickland* prongs in that Sainfil had not demonstrated that Obedin performed deficiently or that Sainfil was prejudiced as a result. (*Id.* at 18–21.) Specifically addressing Sainfil's claim that Obedin was ineffective for failing to move to suppress Sainfil's pre-*Miranda* statements to Wonderland, Judge Hurley found that Obedin's decision to "embrac[e] the post arrest statements was a sound strategy and comported with [Sainfil's] theory of the case, i.e. that he was merely present at the Bank." (*Id.* at 19.) Sainfil's pre-*Miranda* statements to Wonderland had little to no success to be excluded from the evidence at trial because "it does not appear[] that [Sainfil] was subject to a functional equivalent of [an] interrogation." (*Id.*) Furthermore, given that Sainfil made a similar statement post-*Miranda*, Judge Hurley found that Sainfil suffered no prejudice by the admission of the pre-*Miranda* statement. (*Id.* at 20.)

## III.    Sentencing

In anticipation of sentencing, the Presentence Investigation Report (the "PSR"), prepared by the Probation Department calculated Sainfil's total offense level as thirty-six (36) and his criminal history category as four (IV), which resulted in an advisory Sentencing Guidelines range of 262 to 327 months imprisonment on the conspiracy and armed robbery counts. (PSR ¶ 93, ECF No. 166.) After the addition of the statutory mandatory minimum of 84 months for the conviction of brandishing a firearm, the effective recommended advisory Sentencing Guidelines range became 346 to 411 months. (PSR ¶ 93.) The PSR also included recommended sentencing enhancements for (1) taking property from a financial institution, (2) causing bodily injury to a

12

robbery victim and the physical restraint of robbery victims, (3) stealing more than $375,000, (4) use of body armor during the robbery, (5) being a leader/organizer of criminal activity involving five or more participants, and (6) creating a substantial risk of death or serious bodily injury while fleeing from law enforcement. (PSR ¶¶ 26–34.)

At the sentencing hearing on February 25, 2020,[5] Judge Hurley determined that the enhancements for bodily injury to a robbery victim and leader/organizer role were unwarranted, but agreed with the application of the other enhancements, including a two-point enhancement for creating a substantial risk of death or serious bodily injury while fleeing from law enforcement (reckless endangerment during flight) pursuant to U.S.S.G. § 3C1.2. (Sentencing Tr. at 17.) However, in contrast to his application of the other enhancements, Judge Hurley did not elaborate on the reasons why U.S.S.G. § 3C1.2 applied to Sainfil. Before sentencing, Sainfil, through counsel, objected to the application of this enhancement, arguing that Sainfil was not present in the getaway vehicle and was not involved in the police chase. (Pet. PSR Objections at 5–6, ECF No. 222.) The government responded that "co-defendant's flight was conduct that was within the scope of the undertaken Bank robbery, in furtherance of the Bank robbery and completely foreseeable." (Gov't Resp. to Objections at 4, ECF No. 227.) At the sentencing hearing, Judge Hurley explained his reasoning as follows:

> [I]n any event . . . the car was proceeding at a high rate of speed. But whether that is true or not, the evidence clearly indicates that the car that was fleeing the scene following the robbery went the wrong way on an exit ramp from the Southern State Parkway. That in and of itself necessarily involves risk.

---

[5] Sainfil filed the sentencing transcript in the Appendix to his Memorandum of Law in Support of the Petition. (Sentencing Tr., ECF No. 319 at 26–40.) The transcript has since been filed on the docket at ECF No. 363.

(Sentencing Tr. at 10–11.) Judge Hurley determined that Sainfil's total offense level after application of any enhancements, including the U.S.S.G. § 3C1.2 enhancement for reckless endangerment during flight, was 30 and that his criminal history category was IV, which corresponded to a Sentencing Guidelines range of 135 to 168 months of imprisonment on the conspiracy and substantive armed bank robbery count before inclusion of the mandatory 84 months of imprisonment on the brandishing count. (Statement of Reasons at 1, ECF No. 233; Sentencing Tr. at 38:5–16.) The total combined advisory Sentencing Guidelines range was 219 to 252 months. (Statement of Reasons at 1; Sentencing Tr. at 38:5–16.)

Ultimately, Judge Hurley sentenced Sainfil to a total term of imprisonment of 219 months, which consists of concurrent terms of 60 months on the conspiracy count and 135 months on the substantive armed robbery count, to be followed by a consecutive term of 84 months on the count of brandishing a firearm. (Statement of Reasons at 3.)

## IV.    Appeal

Sainfil appealed his conviction and sentence. (ECF No. 234.) On appeal, Sainfil was represented by Michael S. Rayfield, Esq.[6] Through counsel, Sainfil argued that (1) he received ineffective assistance of trial counsel because of Obedin's failure to move to suppress Sainfil's pre-*Miranda* statements to the FBI and concession in the opening statement that Sainfil was located outside the bank at the time of the robbery; (2) the district court improperly calculated the advisory Sentencing Guidelines range by including two two-level sentencing enhancements

---

[6] The Second Circuit Appellate Docket (No. 20-778) provides that Sainfil had various appellate counsel: Randa D. Maher, Andrew G. Levchuck, and, finally, Rayfield. Notably, Levchuk filed an appellate brief on behalf of Sainfil, which was later withdrawn (ECF No. 110) when Levchuk was relieved and Rayfield was appointed to represent Sainfil.

for the use of body armor and physical restraint of bank employees and customers; (3) Sainfil's convictions were not supported by sufficient evidence; and (4) the sentence was substantively unreasonable. (Appellant's Br. at 26–45, No. 20-778 (2d Cir.), ECF No. 121.) The government opposed. (ECF No. 140.)

The Second Circuit affirmed the conviction and sentence in all respects, holding first that trial counsel was not ineffective for not moving to suppress Sainfil's pre-*Miranda* statements or for conceding in the opening statement that Sainfil was located outside the bank during the robbery. *See Gahagen*, 44 F.4th at 107–08, 110–11. The Second Circuit explained that it:

> discern[ed] no prejudice from the admissions of Sainfil's conversation in the car. In his second, post-*Miranda* statement to the FBI, Sainfil effectively said the same thing as the challenged pre-Miranda statement—that is, that his being outside the bank on the day of the robbery did not mean that he robbed it. In light of that second statement, together with the testimony of three cooperating witnesses placing Sainfil outside the bank as a lookout moments before the robbery occurred, Sainfil has not demonstrated 'a reasonable probability that the verdict would have been different if the [challenged] evidence had been suppressed.'

*Id.* at 108 (quoting *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990).[7] Furthermore, the Second Circuit found that:

> [Sainfil's] trial counsel's concession must be evaluated in light of the record evidence, including, at a minimum, Sainfil's post-*Miranda* statement to the FBI (the admissibility of which Sainfil does not contest, and which strongly suggested that Sainfil was not resisting the claim that he was indeed outside the bank during the robbery) and the detailed witness testimony placing Sainfil outside the bank as a lookout.

*Id.* It further concluded that under the *Strickland* standard, the district court did not err "in determining that Sainfil's counsel's concession 'was a reasonable trial strategy to establish a

---

[7] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, brackets, and citations.

15

forthright relationship with the jury, by conceding what the defense did not have evidence to contest.'" *Id.* (quoting *Bierenbaum v. Graham*, 607 F.3d 36, 52 (2d Cir. 2010)).

The Second Circuit also held that there was sufficient evidence to support Sainfil's convictions on all three counts and that his sentence was procedurally and substantively reasonable. *See id.* at 108–13. On the latter issue, the Second Circuit specifically upheld the application of the two-level bulletproof vest enhancement and the two-level enhancement for restraining bank employees and customers during the robbery. *See id.* at 109–13.[8]

Sainfil petitioned the Supreme Court for writ of certiorari, which was denied. *See Sainfil v. United States*, 143 S. Ct. 1069 (2023).

## V.    Procedural History

On November 14, 2023, Sainfil timely filed the present Petition. He asks the Court to vacate, set aside, or correct his sentence, arguing: (1) that the district court erred when it applied a two-level sentencing enhancement under U.S.S.G. § 3C1.2 for reckless endangerment during flight; (2) that his appellate attorney was ineffective for failing to challenge this enhancement on appeal; (3) that his trial and appellate counsel were ineffective based on other incidents/failures; and (4) that Sainfil was subjected to multiple instances of prosecutorial misconduct. (Pet. at 1–4; Mem. Supp. at 1–24.) The government opposes each of these arguments. (Mem. Opp'n.) On reply, Sainfil reiterates his arguments and asks for an evidentiary hearing. (Reply at 1–17.)

---

[8] While the majority affirmed the application of the body armor enhancement to Sainfil, this point prompted a dissenting opinion, which specifically disagreed with the majority that the record supported the district court's finding that it was reasonably foreseeable to Sainfil that Wells would wear body armor. *See Gahagen*, 44 F.4th at 113–15 (Jacobs, J., dissenting). The dissent concluded that "[t]he affirmance of the body armor enhancement reduces reasonable foreseeability to a guess, and results in an unjustified piling on of sentencing enhancements." *Id.* at 115.

16

On July 25, 2024, this Court ordered Sainfil's appellate counsel, Rayfield, to respond to Sainfil's argument that Rayfield provided ineffective assistance on appeal by failing to argue that the district court erred in applying the two-level enhancement under U.S.S.G. § 3C1.2 for reckless endangerment during flight. (July 25, 2024 Order.) The Court also ordered the government to provide all trial exhibits, including the video surveillance recordings. (*Id.*)

On September 25, 2024, Rayfield filed an affirmation responding to the Court's Order. (Rayfield's Aff., ECF No. 341.) The government also filed all of its trial exhibits.[9]

## LEGAL STANDARDS

### I.    Section 2255 Petition

28 U.S.C. § 2255(a) permits a prisoner in federal custody to move to vacate, set aside, or correct a sentence on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." Such relief is "narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources." *United States v. Hoskins*, 905 F.3d 97, 102 (2d Cir. 2018). Therefore, "collateral attack on a final judgment in a criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Graziano v. United States*, 83 F.3d 587, 589–90 (2d

---

[9] On August 19, 2024, the Court received physical copies of some video and audio recordings as well as other documents from Sainfil. (ECF Nos. 335, 336.) Sainfil appeared to have misunderstood the Court's July 25, 2024 Order as requiring him, rather than the government, to provide trial exhibits. The Court did not rely on Sainfil's filings because the Court is not in the position to authenticate them.

Cir. 1996); *see also Lopez v. United States*, 792 Fed. App'x 32, 35 (2d Cir. 2019). "Insofar as claims regarding a sentencing court's error in failing to properly apply the Sentencing Guidelines are neither constitutional nor jurisdictional . . . absent a complete miscarriage of justice, such claims will not be considered on a § 2255 motion where the defendant failed to raise them on direct appeal." *Graziano*, 83 F.3d at 590.

Where, like here, the petitioner proceeds pro se, the Court construes petitioner's submissions liberally and interprets them to raise the strongest arguments that they may suggest. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam).

## II.    Procedural Bars

On direct appeal, the Second Circuit reviews errors not raised in the district court under the plain error standard of Rule 52(b), Fed R. Crim. P., which provides that "[a] plain error that affects substantial rights may be considered even though it was not brought to the court's attention." Under this standard, an appellate court may only correct an error not raised before the district court where the appellant demonstrates that:

> (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*United States v. Wernick*, 691 F.3d 108, 113 (2d Cir. 2012). Moreover, "the plain error doctrine should not be applied stringently in the sentencing context, where the cost of correcting an unpreserved error is not as great as in the trial context." *Id.*

Different standards apply when a person collaterally attacks their conviction or sentence. *United States v. Frady*, 456 U.S. 152, 164 (1982). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established

rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010). First, according to the so-called mandate rule "[i]t is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal." *United States v. Pitcher*, 559 F.3d 120, 123 (2d Cir. 2009); *see also Williams v. United States*, 712 Fed. App'x 50, 52 (2d Cir. 2017). Importantly, "[t]he mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." *Yick Man Mui*, 614 F.3d at 53; *see also Burrell v. United States*, 467 F.3d 160, 165 (2d Cir. 2006) ("[W]here [the] issues have been explicitly or implicitly decided on appeal, the district court is obliged, on remand, to follow the decision of the appellate court.")

Second, the procedural default rule instructs that the "claims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice." *Massaro v. United States*, 538 U.S. 500, 504 (2003); *see also Yick Man Mui,* 614 F.3d at 54 (holding that where a claim is procedurally defaulted by a failure to raise it on direct appeal, the "petitioner must show cause for failing to raise the claim at the appropriate time and prejudice from the alleged error" (quoting *Marone v. United States*, 19 F.3d 65, 67 (2d Cir. 1993))); *Tavarez v. United States*, 81 F.4th 234, 239 (2d Cir. 2023) (recognizing that "where such a claim was not raised on direct review," a habeas petitioner must show "cause" and "actual "prejudice" or actual innocence (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998))). Crucially, ineffective assistance of counsel claims are exempt from this rule and "may appropriately be raised for the first time in a Section 2255 motion, 'whether or not the petitioner could have raised

19

the claim on direct appeal.'" *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (quoting *Massaro*, 538 U.S. at 504); *see also Morales v. United States*, 651 Fed App'x 1, 5 (2d Cir. 2016) ("Ineffective assistance of appellate counsel can constitute cause to excuse a procedural default.").

### III.     Ineffective Assistance of Counsel

In *McMann v. Richardson*, the Supreme Court held that the Sixth Amendment right to counsel is the right to the effective assistance of counsel. 397 U.S. 759, 771 (1970). To prevail on an ineffective assistance of counsel claim, a petitioner must satisfy both prongs of the *Strickland* test, which requires demonstrating that (1) "counsel's representation fell below an objective standard of reasonableness . . . under prevailing norms" and (2) the petitioner suffered prejudice as a result of counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 692 (1984). "The *Strickland* standard is both 'highly demanding' and 'rigorous.'" *McKenzie v. United States*, No. 12-cv-3221, 2016 WL 1573450, at * 2 (E.D.N.Y. Apr. 18, 2016) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)); *see also United States v. Nolan*, 956 F.3d 71, 79 (2d Cir. 2020) ("The standard of *Strickland* is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on it.") (internal quotation marks omitted).

To satisfy the first prong, the petitioner must demonstrate that counsel acted outside of the wide range of reasonable professional assistance and made errors so serious that the counsel failed to function as guaranteed by the Sixth Amendment. *See Strickland*, 466 U.S. at 687–89. In analyzing this prong, a court must be objective, "eliminate the distorting effects of hindsight[,]" and "evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Furthermore, the

20

court is to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The second prong, by contrast, can be analyzed "with the benefit of hindsight." *Purcell v. United States*, 158 F.4th 441, 450 (2d Cir. 2025) (internal citation omitted). "To meet the prejudice prong, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of *the proceeding* would have been different." *Id.* (internal citation omitted).

The *Strickland* test applies to claims concerning the ineffective assistance of appellate counsel. *See Mayo*, 13 F.3d at 533; *see also Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993) ("Although *Strickland* addressed the constitutional standard for ineffective assistance of counsel in the trial counsel context, our Circuit has also adopted the *Strickland* two-prong test in assessing the effectiveness of appellate counsel.") With regard to the first prong, an "[a]ppellate counsel does not have a duty to raise all colorable claims on appeal; rather, counsel should use reasonable discretion to determine which claims constitute a defendant's best arguments for obtaining a reversal of a conviction." *Waiters v. United States*, 472 F. Supp. 3d 7, 15 (E.D.N.Y. 2020). However, on the second prong, "[t]he fact that precisely the same claim was successful on appeal pursued by a similarly situated litigant is a strong indication that the failure of the petitioner's counsel to press that claim was prejudicial, for '[a]n assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like.'" *McKee*, 167 F.3d at 107 (quoting *Strickland*, 466 U.S. at 695).

21

Where a habeas petitioner makes an insufficient showing on one of the *Strickland* prongs, the court is not required to address the other prong. *See Strickland*, 466 U.S. at 697.

## IV.      28 U.S.C. 2255(b) Evidentiary Hearing Standard

A habeas petitioner seeking an evidentiary hearing, as Sainfil does here, must meet a demanding standard. "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. § 2255(b). However, "Second Circuit 'precedent disapproves of summary dismissal of petitions where factual issues exist[ ], but permits a 'middle road' of deciding disputed facts on the basis of written submissions.'" *Yick Man Mui v. United States*, No. 99-CV-03627, 2011 WL 2650673, at *2 (E.D.N.Y. July 6, 2011) (quoting *Pham v. United States*, 317 F.3d 178, 184 (2d Cir. 2003)); *see also Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001) (discussing that "the district court may use methods under Section 2255 to expand the record without conducting a full-blown testimonial hearing.")

"To warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a plausible claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." *Puglisi v. United States,* 586 F.3d 209, 213 (2d Cir. 2009). Rule 4(b) of the Rules Governing Section 2255 Proceedings further provides that "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." *Id.* (quoting Rules Governing Section 2255 Proceedings for the United States District Courts, Rule 4(b)).

**DISCUSSION**

I.    **Application of U.S.S.G. § 3C1.2 to Calculation of Sainfil's Advisory Sentencing Guidelines Range**

Sainfil makes two arguments with respect to the district court's application of the sentencing enhancement for reckless endangerment during flight under U.S.S.G. § 3C1.2 to Sainfil. First, Sainfil argues that the sentencing court erred by applying this two-level sentencing enhancement, and that this error resulted in the improper calculation of his total offense level as 30 instead of 28, which in turn resulted in an advisory Sentencing Guidelines range that was 24 months longer than it would otherwise have been. (Mem. Supp. at 2.) Second, Sainfil argues that his appellate counsel was ineffective by failing to argue on appeal that the district court erred in applying the U.S.S.G. § 3C1.2 enhancement in the calculation of his advisory Sentencing Guidelines range. (Pet. at 1–2; Mem. Supp. at 1–2; Reply at 2–3.)

A.    District Court's Calculation of the Advisory Sentencing Guidelines Range

Because Sainfil's challenge to the advisory Sentencing Guidelines calculation, which he failed to raise on direct appeal, concerns only the sentencing court's application of the reckless endangerment enhancement and not a jurisdictional or constitutional error, his challenge is not cognizable in a Section 2255 motion absent a showing of a "complete miscarriage of justice." *Graziano*, 83 F.3d at 590; *see also* Mem. Opp'n at 10–12. Under this standard, several other circuits have concluded that "sentences imposed pursuant to advisory Guidelines" based on certain "erroneous or later invalidated" sentencing enhancements do "not result in a complete miscarriage of justice sufficient to warrant collateral relief." *Hoskins*, 905 F.3d at 104 n.7 (citing cases from the Fourth, Eleventh, Seventh, and Third Circuits concerning the career offender enhancement). The Second Circuit, by contrast, has not reached a "categorical conclusion" on

23

this question. *Id*. Rather, it has made clear that because a district judge's sentence is guided not just by the applicable advisory Sentencing Guidelines range but also by an "individualized assessment" that the sentence is "no greater than necessary to satisfy the stated sentencing purposes" under 18 U.S.C. § 3553(a), the advisory nature of the Sentencing Guidelines range is just "one factor, among others" relevant to the determination of whether a sentence is a "complete miscarriage of justice." *Id.*

Courts in this Circuit have therefore held that misapplication of the "advisory Guidelines scheme" generally does not automatically constitute a "fundamental defect or a complete miscarriage of justice." *See, e.g.*, *Canales v. United States*, No. 13-cr-0298, 2018 WL 1936135, at *5 (E.D.N.Y. Apr. 24, 2018); *Gomez-Rodriguez v. United States*, No. 3:18-cv-807, 2020 WL 1430011, at *5 (D. Conn. Mar. 24, 2020). Likewise, the Second Circuit has recognized that "although a within-Guidelines sentence is not presumptively reasonable, we have observed that in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Pollok*, 139 F.4th 126, 145 (2d Cir. 2025), *cert. denied sub nom. Ray v. United States*, 146 S. Ct. 834 (2025) (internal citation and quotation marks omitted).

Here, Judge Hurley applied the two-level enhancement for reckless endangerment during flight and thereby calculated Sainfil's total offense level as 30, which, together with Sainfil's criminal history category of IV, yielded an advisory Sentencing Guidelines range of 135 to 168 months of imprisonment on the conspiracy and armed bank robbery counts before inclusion of the mandatory minimum 84-month sentence on the brandishing count. (Statement of Reasons at 1.) He then sentenced Sainfil to 135 months on the armed bank robbery count, noting that this

24

was "the bottom of the applicable [advisory] guideline range" and that a lower sentence would not "be appropriate in this case given the totality of the circumstances." (Sentencing Tr. at 37:24–38:4.) Sainfil argues that Judge Hurley failed to make adequate findings of fact before applying the two-level reckless engagement enhancement in U.S.S.G. § 3C1.2. (Mem. Supp. at 2.)

For the reasons explained below, there is a reasonable probability that Judge Hurley's application of the U.S.S.G. § 3C1.2 sentencing enhancement constituted error. *See infra*, Discussion § I.B. However, assuming that Judge Hurley erred in calculating the advisory Sentencing Guideline range by applying this two-level enhancement, it is a close question as to whether Sainfil has shown that this error resulted in a "fundamental defect or a complete miscarriage of justice." *Graziano*, 83 F.3d at 590.

On the one hand, Judge Hurley sentenced Sainfil to 135 months on the armed bank robbery count and explicitly noted that such a prison term was "the bottom" of the applicable advisory Sentencing Guidelines range for the conspiracy and armed bank robbery counts. Such a statement suggests that the correct calculation of a lower advisory Sentencing Guidelines range would have led Judge Hurley to impose a shorter prison term on the armed bank robbery count.

On the other hand, Judge Hurley also stated that a sentence lower than 135 months of imprisonment would not "be appropriate in this case given the totality of the circumstances," which suggests that he was imposing a non-Guidelines sentence based on consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a). Like the petitioner in *United States v. Hoskins*, Sainfil challenges the application of a sentencing enhancement to calculate a Sentencing Guidelines range that was "advisory, not mandatory." 905 F.3d at 104 n.7. Here, had

25

Judge Hurley not applied the U.S.S.G. § 3C1.2 reckless endangerment enhancement, Sainfil's resulting total offense level of 28 together with the same criminal history category of IV would warrant an advisory Sentencing Guidelines range of 110 to 137 months. U.S. Sent'g Guidelines Manual § 5A (U.S. Sent'g Comm'n 2021). Accordingly, the sentence of 135 months of imprisonment imposed by Judge Hurley on the armed bank robbery count falls within the advisory Sentencing Guidelines range whether the total offense level is calculated at 28 or 30. Therefore, even assuming that Judge Hurley's advisory Sentencing Guidelines range calculation was erroneous, the imposed sentence was still within the applicable range and not a complete miscarriage of justice. *See Pollok*, 139 F.4th at 145.

Ultimately, this Court need not resolve the question of whether the sentencing court's imposition of a sentence of 135 months of imprisonment on the armed bank robbery count resulted in a "complete miscarriage of justice" adequate to warrant habeas relief, *Hoskins*, 905 F.3d at 104 n.7, because the record clearly demonstrates ineffective assistance of appellate counsel for failure to raise Sainfil's objection to the application of U.S.S.G. § 3C1.2 on appeal, which provides the basis for habeas relief. *See supra* § I.B.

### B. Ineffective Assistance of Appellate Counsel

Sainfil next argues that his appellate counsel, Rayfield, was ineffective because he failed, despite Sainfil's insistence, to argue on appeal to the Second Circuit that the district court erred in applying the U.S.S.G. § 3C1.2 sentencing enhancement. (Mem. Supp. at 2–3.) Consequently, Sainfil argues that this failure led to the denial of a resentencing hearing that would have resulted in the imposition of a lower sentence. (*Id.*)

The Second Circuit addressed the findings that a district court must make before applying a sentencing enhancement under U.S.S.G. § 3C1.2 in *United States v. McCrimon*, 788 F.3d 75, 78 (2015). "[B]y the plain language of the Guidelines, the district court may not apply the U.S.S.G. § 3C1.2 enhancement unless it finds" (1) that the "defendant himself 'recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer'" or (2) that he "'aided[,] abetted,' or otherwise contributed to the creation of such a risk in one of the enumerated ways." *McCrimon*, 788 F.3d at 78 (quoting U.S.S.G. § 3C1.2). In other words, "some form of direct or active participation . . . is necessary in order for § 3C1.2 to apply." *Id.* at 79. Therefore, although the general rule under the Sentencing Guidelines is that its provisions apply to all "reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken criminal activity," *id.* (quoting U.S.S.G. § 1B1.3(a)(1)(B)), with respect to U.S.S.G. § 3C1.2, a court "err[s] by applying the enhancement based merely on a finding that [the defendant] could have reasonably foreseen that his co-defendant would recklessly endanger others while fleeing from the police," *id.* at 79.

Sainfil argues that he "pointed [Rayfield] to this Circuit's decision in *United States v. McCrimon*" and that under *McCrimon*, his argument that the court erred in applying § 3C1.2 "would have been a[n] easy argument to win because even [Judge Hurley] states that [Sainfil] played no role in his co-defendant's fleeing the scene." (Mem. Supp. at 3.) In his response to Sainfil's ineffective assistance of appellate counsel claim, Rayfield admits that he and Sainfil had a discussion about the challenge to the U.S.S.G. § 3C1.2 enhancement and that Rayfield believed this was a "colorable" argument on appeal. (Rayfield's Aff. at 2.) According to Rayfield,

27

however, he made a "professional judgment" to cabin the appeal to four other issues, which he thought were more likely to succeed. (*Id.*)

In determining whether that decision constituted ineffective assistance of appellate counsel under *Strickland*, the Court considers (1) whether Rayfield's failure to argue to the Second Circuit that the district court failed to comply with *McCrimon* constituted deficient performance, and (2) whether the outcome of the proceeding would have been different but for counsel's shortcomings. *See Strickland*, 466 U.S. at 694.

### a. *Deficient Performance*

Under the first prong of *Strickland*, Rayfield's performance was constitutionally deficient. Applying the legal standards governing this prong, the Court begins with the "strong presumption" that Rayfield's performance was adequate, *Strickland*, 466 U.S. at 689. Rayfield was neither expected nor required to raise every potentially meritorious argument in the appeal. *See McKee*, 167 F.3d at 106. However, Sainfil may "rebut the suggestion that the challenged conduct"—Rayfield's failure to appeal the reckless endangerment enhancement—"reflected merely a strategic choice . . . by showing that counsel omitted [a] significant and obvious issue[] while pursuing issues that were clearly and significantly weaker." *Id.* (quoting *Mayo*, 13 F.3d at 533). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Mayo*, 13 F.3d at 533. The question therefore is whether Sainfil's challenge to the reckless endangerment enhancement under U.S.S.G. § 3C1.2 concerned a "significant and obvious issue" that was clearly stronger than his basis for raising the other arguments he made on appeal. *McKee*, 167 F.3d at 106.

28

Sainfil has met this standard. First, Sainfil's challenge to the sentencing court's application of U.S.S.G. § 3C1.2 was a "significant and obvious issue[]" because his claim is squarely addressed by *McCrimon*. Here, Judge Hurley applied the sentencing enhancement for reckless endangerment during flight on the basis that Homere, Jackson, and Rose led police on a brief pursuit against traffic. (Trial Tr. at 52–55.) Similarly, in *McCrimon*, the district court applied the same sentencing enhancement to a defendant who was sentenced for bank robbery and whose co-defendant had led police on high speed "chase through busy streets . . . sometimes on the wrong side of the road." 788 F.3d at 77. While Sainfil was not in the getaway vehicle that fled the robbery, in *McCrimon*, the defendant was a *passenger in the getaway car*, and the government submitted testimony showing that the defendant "*encouraged* [his co-defendant] to flee from the police and to increase his speed." *Id.* 77 (emphasis added). Nevertheless, the Second Circuit vacated and remanded the sentence on the grounds that the district court had erroneously applied U.S.S.G. § 3C1.2 based "merely on a finding that [the defendant] *could have reasonably foreseen* that his co-defendant would recklessly endanger others while fleeing." *Id.* at 79 (emphasis added). Although the Second Circuit left for the district court to consider whether the defendant's sentence could be enhanced under the proper aiding or abetting standard under U.S.S.G. § 3C1.2, it made clear that "knowingly participating in an armed robbery in which getaway vehicles are part of the plan is insufficient as a matter of law, without more, to allow a district court to impose this enhancement on individuals not directly committing the acts amounting to reckless endangerment." *Id.*

The sentencing court here applied the U.S.S.G. § 3C1.2 reckless endangerment enhancement to Sainfil without making any finding that Sainfil did anything more than

29

"knowingly participate[]" in a robbery in which his co-conspirators planned to use getaway vehicles. *Id.* Indeed, the sentencing court's complete factual findings concerning its decision to apply the U.S.S.G. § 3C1.2 enhancement consisted of noting that "the [getaway] car [was] proceeding at a high rate of speed" and that "the evidence clearly indicates that the car that was fleeing the scene following the robbery went the wrong way on an exit ramp from the Southern State Parkway. That in and of itself necessarily involves risk." (Sentencing Tr. at 10:24–11:5.) Judge Hurley did not make any factual findings regarding Sainfil's knowledge of or role in creating that "risk"; nor did he state the legal standard that governs the application of the U.S.S.G. § 3C1.2 reckless endangerment enhancement to the calculation of the advisory Sentencing Guidelines range. The trial transcript also does not reveal any further evidence that Sainfil "aided or abetted" Homere, Jackson, and Rose as they fled police in a vehicle down the wrong way on an exit ramp. *McCrimon*, 788 F.3d at 78. As Rayfield admits, "[t]he government never alleged that Mr. Sainfil was one of the men who fled the scene of the robbery immediately after it occurred." (Rayfield Aff. ¶ 9.) Thus, the facts on which the sentencing court relied to apply U.S.S.G. § 3C1.2 to Sainfil are even more attenuated than those present in *McCrimon*, where the defendant rode in the getaway vehicle and purportedly encouraged flight at a high speed. 788 F.3d at 77.

Nonetheless, Rayfield attests that he "did not believe that [] *McCrimon* was necessarily dispositive" because, although the government never alleged that Sainfil fled the scene of the robbery, it "did present evidence [] that Mr. Sainfil helped plan the robbery, including the means of escape." (Rayfield Aff. ¶ 9.) In support, Rayfield points out that "McCarthy [] testified that Sainfil was present at the meeting with Homere during which Homere detailed the drop-off and

pick-up locations of the co-conspirators after the robbery." (Rayfield Aff. ¶ 9 (quoting *Gahagen*, 44 F.4th at 102-03).) However, this evidence demonstrates only "[k]nowing participat[ion] in an armed robbery in which getaway vehicles are part of the plan" and not "some form of active participation" in causing the reckless endangerment during flight. *McCrimon*, 788 F.3d at 79. Thus, this explanation for Rayfield's failure to appeal application of the U.S.S.G. § 3C1.2 enhancement is unreasonable.

Rayfield provides two additional explanations for his professional judgment to omit Sainfil's challenge to the reckless endangerment enhancement, both of which go to the question of whether Sainfil's basis for challenging the enhancement was stronger than the arguments that Rayfield did make on appeal. Those two explanations are: (1) that Rayfield "made a professional judgment to focus primarily on the argument that, from [his] perspective, provided Mr. Sainfil with the best ground for a full vacatur of his conviction and sentence" (Rayfield Aff. ¶ 6.); and (2) that Rayfield "was concerned that, because Mr. Sainfil's trial counsel did not press for a ruling [on this issue], the Second Circuit would review the issue for plain error" (*Id*. ¶ 8). Neither is persuasive.

First, it is true that the "lead argument" in Sainfil's direct appeal—that trial counsel was ineffective—offered a means to seek a "full vacatur of [Sainfil's] conviction and sentence." (Rayfield Aff. ¶ 2, 6.) However, this explanation for abandoning Sainfil's challenge to the reckless endangerment enhancement is unpersuasive because Rayfield appealed two other two-level sentencing enhancements applied to calculate the advisory Sentencing Guidelines range for Sainfil's offenses: one for use of body armor under U.S.S.G. § 3B1.5 and the other for physical restraint of bank employees and customers under U.S.S.G. § 3A1.3. (Appellant's Br. at 39–42.)

31

Rayfield argued on appeal that Sainfil could not reasonably foresee that his co-conspirators would use body armor or that they would use restraints on bank employees and customers. (*Id.*) However, neither challenge, if successful, would have resulted in a full vacatur of Sainfil's conviction and sentence as both challenges concerned the sentencing court's application of a two-level sentencing enhancement to the calculation of Sainfil's total offense level—the same level of enhancement as U.S.S.G. § 3C1.2. Nevertheless, Rayfield challenged the application of these two other sentencing enhancements, while not making an available, strong argument concerning the sentencing court's error in applying U.S.S.G. § 3C1.2.

Although the Second Circuit disagreed with Sainfil and held that, on the record before the district court, both the use of body armor and the restraint of the bank employees and customers were reasonably foreseeable to Sainfil, Judge Jacobs dissented in part. *See Gahagen*, 44 F.4th at 109–12; *id.* at 113–15 (Jacobs, J., concurring in part and dissenting in part). While he agreed with the majority's ruling on the physical restraint enhancement, he explained that he would have found that the record on appeal did not present sufficient evidence that it was reasonably foreseeable to Sainfil that his co-conspirator—Wells—would be wearing body armor, and that the enhancement under U.S.S.G. § 3B1.5 was incorrectly applied. *Id.* at 113–15 (Jacobs, J., concurring in part and dissenting in part).

Rayfield's choice to appeal Judge Hurley's application of enhancements under U.S.S.G. §§ 3B1.5 and 3A1.3, but not to appeal the application of the U.S.S.G. § 3C1.2 reckless endangerment enhancement is puzzling. Rayfield opted to prioritize appealing enhancements under §§ 3B1.5 and 3A1.3, which only required a factual showing of reasonable foreseeability, even though the sentencing court was required to find that a higher standard—that Sainfil *aided*

32

*or abetted* his co-defendants—was met in order to apply the reckless endangerment enhancement under U.S.S.G. § 3C1.2. This defies logic. Moreover, the factual record for Sainfil was also stronger for an appeal challenging the application of the reckless endangerment enhancement. In his sentencing memorandum, Sainfil's trial counsel objected to the PSR's application of the reckless endangerment enhancement on the ground that, because Sainfil was not involved in the flight, the enhancement "could not apply" to him under *McCrimon*. (Pet. PSR Objections at 6.) However, Judge Hurley did not even acknowledge that Sainfil had objected to the application of the reckless endangerment enhancement to calculate the advisory Sentencing Guidelines range. This is notable because Judge Hurley did address Sainfil's objections to the other sentencing enhancements recommended in the PSR and made specific factual findings that it was "reasonably foreseeable" that one or more of Sainfil's co-defendants would use body armor, as required for application of U.S.S.G. § 3B1.5, and would use restraints on bank employees, as required for application of U.S.S.G. § 3A1.3. (*See* Sentencing Tr. 12:8–11.) It may be that Judge Hurley had intended to make further factual findings regarding application of the U.S.S.G. § 3C1.2 reckless endangerment enhancement, but ultimately did not do so. (*See* Sentencing Tr. at 12:8–11.)[10] Nevertheless, as noted above, the facts here show an even clearer lack of evidentiary basis for application of U.S.S.G. § 3C1.2 than the facts in *McCrimon*.

---

[10] Shortly after making the factual findings discussed above with respect to the reckless endangerment enhancement, Judge Hurley stated, "I'm going to shift gears. I mentioned a moment ago, I would address flight next, but I'll not do that. I'll proceed in the sequence which is set forth in the probation report." (*See* Sentencing Tr. at 12:8–11.) However, Judge Hurley never returned to address the reckless endangerment enhancement.

33

Rayfield's second explanation for his failure to appeal the enhancement—that the Second Circuit would review the sentencing court's application of the enhancement only for plain error—is similarly unpersuasive. Even under plain error review, Sainfil's grounds for appeal were "clearly stronger" for the reckless endangerment enhancement than for the two-level sentencing enhancements under U.S.S.G. §§ 3A1.3 and 3B1.5. *Mayo*, 13 F.3d at 533. Although Sainfil's trial counsel challenged the reckless endangerment enhancement in her sentencing submission (Sentencing Mem. at 2, ECF No. 228), she did not reassert Sainfil's objection at the sentencing hearing, despite the sentencing court's oversight in failing to address the objection. (*See* Tr. at 29–32.) Therefore, the Second Circuit would have reviewed the issue for plain error had it been raised on appeal. Nevertheless, even under plain error review, the Second Circuit may have found that the sentencing court plainly erred in applying the reckless endangerment enhancement. In *McCrimon*, the Second Circuit applied plain error review to the very same error made by a district court and reversed, holding that the error was clear or obvious because, "by the plain language of the Guidelines," the district court may not apply the U.S.S.G. § 3C1.2 enhancement unless it finds that the defendant recklessly created the risk or "aided or abetted, counseled, commanded, induced, procured, or willfully caused" others to create the risk. *McCrimon*, 788 F.3d at 78–79*; see also Wernick*, 691 F.3d at 113 (noting that "the plain error doctrine should not be applied stringently in the sentencing context, where the cost of correcting an unpreserved error is not as great as in the trial context").[11]

---

[11] As explained above, whether the error at issue is clear or obvious is the second prong of the plain error analysis. The Second Circuit in *McCrimon* held that the third and fourth prongs of the

Accordingly, Rayfield's performance was constitutionally deficient under *Strickland*.

### b. *Prejudice*

Turning to the second prong of *Strickland*, Sainfil suffered prejudice as a result of Rayfield's failure to appeal the reckless endangerment enhancement.

The Second Circuit has repeatedly held that a "district court must make specific factual findings, by a preponderance of the evidence, to support any sentencing enhancement under the Guidelines." *United States v. Ahders*, 622 F.3d 115, 119 (2d Cir. 2010). "A district court need not specifically recite all the facts relevant to its Guidelines calculation; rather, it is sufficient for the district court to adopt the findings in the presentence report *if* those findings are adequate to support the sentence imposed." *Id.* (emphasis in original). As explained, Judge Hurley did not make any factual findings regarding Sainfil's knowledge of or role in creating that "risk"; nor did he state the legal standard that governs the application of the U.S.S.G. § 3C1.2 reckless endangerment enhancement to calculation of the advisory Sentencing Guidelines range. (Sentencing Tr. at 10:24–11:5.) Because the sentencing court failed to make sufficient factual findings to support its application of the sentencing enhancement for reckless endangerment during flight under U.S.S.G. § 3C1.2, the Second Circuit would have likely found the district court erred if this issue had been raised on appeal. *See McCrimon*, 788 F.3d at 79 (concluding "that the district court plainly erred in applying the U.S.S.G. § 3C1.2 sentencing enhancement

---

analysis were also met because application of the two-level enhancement for reckless endangerment had a "potentially serious impact on the sentence imposed." 788 F.3d at 79. The Second Circuit's holding applies here where the exact same enhancement is at issue. Indeed, as demonstrated in *infra*, Discussion I.B.b, Sainfil would have faced an advisory Sentencing Guidelines range of 110 to 137 months instead of 135 to 168 months had the reckless endangerment enhancement not been applied to him.

based solely on a finding that McCrimon reasonably could have foreseen that his co-defendant would recklessly endanger others while fleeing from the scene of his bank robbery").

"The fact that precisely the same claim was successful on appeal pursued by a similarly situated litigant is a strong indication that the failure of the petitioner's counsel to press that claim was prejudicial." *McKee*, 167 F.3d at 107. *McCrimon* involved nearly the same challenge to the application of the reckless endangerment enhancement brought in nearly identical factual circumstances, specifically that the sentencing court plainly erred in applying the enhancement based solely on a recitation of facts that at best show that the defendant reasonably could have foreseen that his co-defendant would recklessly endanger others while fleeing from the scene of a bank robbery. *See supra*, Discussion § I.B.a. Because the Second Circuit in *McCrimon* reversed the district court, there is a "reasonable probability that the outcome of the proceeding would have been different" had Rayfield challenged on appeal the application of the U.S.S.G. § 3C1.2 enhancement to calculate Sainfil's advisory Sentencing Guidelines range by citing *McCrimon*. *Mayo*, 13 F.3d at 534. In other words, had Rayfield made such a challenge on appeal, there is a reasonable probability that the Second Circuit would have reversed the district court's application of U.S.S.G. § 3C1.2, which would have led to the calculation of a different and lower advisory Sentencing Guideline range for Sainfil.

There is also a "reasonable probability" that the actual sentence Sainfil would have received would have been different. As a result of the application of the two-level enhancement under U.S.S.G. § 3C1.2, the Judge Hurley calculated Sainfil's advisory Sentencing Guidelines range on the conspiracy and armed bank robbery counts to be 135 to 168 months. (Statement of Reasons at 1.) By contrast, without the application of that two-level sentencing enhancement,

36

Sainfil's advisory Sentencing Guidelines range would be 110 to 137 months, not including the mandatory minimum on the count for brandishing a firearm. U.S. Sent'g Guidelines Manual § 5A (U.S. Sent'g Comm'n 2021).

Moreover, Judge Hurley explicitly referenced the advisory Sentencing Guidelines range when sentencing Sainfil to 135 months on the armed robbery count, noting that this was "the bottom of the applicable [advisory] guideline range" and that a lower sentence would not "be appropriate in this case given the totality of the circumstances." (Sentencing Tr. at 37:24–38:4.) He noted that although he found that the "crime here was horrendous," Sainfil was "not a leader and not a supervisor and not a manager," and that he was "impressed with the relationship [Sainfil] has with his mother and . . . hope[d] that when he is released back into society[,] he'll be able to conform with the norms and rules of society." (Sentencing Tr. at 36:22–23, 37:9–14.) In light of these findings and considerations, had Judge Hurley properly calculated the advisory Sentencing Guidelines range to be 110 to 137 months, there is a reasonable probability that he would have sentenced Sainfil to 110 months—the bottom of that range. *See Mayo*, 13 F.3d at 534. Accordingly, Sainfil was prejudiced by Rayfield's deficient performance.

For all of these reasons, Sainfil has shown that he suffered a violation of his Sixth Amendment rights due to the ineffective assistance of appellate counsel in failing to raise on appeal the district court's erroneous application of the two-level U.S.S.G. § 3C1.2 enhancement when calculating the advisory Sentencing Guidelines range.

## II.    Additional Claims of Ineffective Assistance of Trial and Appellate Counsel

Next, Petitioner raises multiple other claims of ineffective assistance of both trial and appellate counsel. The Court addresses them in order.

A. Failure of Appellate Counsel to Advise Sainfil of the Proper Deadline to Request *En Banc* Rehearing.

Sainfil further claims that Rayfield, his appellate counsel, was ineffective for failing to inform him of the correct deadline to request en banc rehearing of his appeal. (Mem. Supp. at 1; Reply at 1.) The Second Circuit has recognized that CJA counsel "must advise their clients of the opportunity not only to petition for certiorari, but also to petition for rehearing and rehearing *en banc*." *Taylor v. United States*, 822 F.3d 84, 94 (2d Cir. 2016). Where a defendant requests to file a petition for rehearing *en banc* but counsel views the filing as frivolous, counsel must "inform the client of the opportunity to petition *pro se*, move to withdraw, and, at the same time, file a motion for [an] extension of time to petition so that the client may seek relief *pro se*." *Id.* The remedy for an ineffective assistance of counsel claim when counsel fails to take these steps is for the Second Circuit to "recall the mandate and reenter judgment to restart the clock for the time to file a timely petition." *Id.* at 89. Accordingly, it is not clear that this Court has the power to grant relief on this claim. However, even if it does, Sainfil's claim is unsuccessful because he already filed an unsuccessful motion with the Second Circuit to recall the mandate and cannot show prejudice under *Strickland*. *See Strickland*, 466 U.S. at 697 (holding that if the petitioner makes an insufficient showing on one of the prongs, there is no need for the court to address the other).

First, the Second Circuit already denied Sainfil's motion, filed on August 31, 2022, which requested recall of the mandate. (*United States v. Sainfil*, No. 20-778 (2d Cir.), ECF Nos. 193-1, 207.) In a memorandum of law supporting his motion to withdraw as appellate counsel for Sainfil, Rayfield explained that he had "'reasonable grounds to believe' that the petitions for rehearing . . . 'would have no likelihood of success.'" (*Id.*, ECF No. 198 at 3 (quoting Local Rule

38

4.1(c)).) He further provided that he had "communicated that view to Mr. Sainfil, and he wishes to file the petitions *pro se*." (*Id.*)[12] However, as Rayfield explained in a declaration supporting Sainfil's motion to recall the mandate,

> 5. I made an unfortunate error in my interpretation of Rule 40(a)(1). I believed that because the United States is a party in the case, the deadline for Mr. Sainfil's petition for rehearing was September 26, 2022. This was incorrect; Rule 40(a)(1)(A) applies only "in a civil case."
>
> 6. On August 31, 2022, the Court issued the mandate. I immediately consulted Rule 40(a)(1) and discovered my error. I called the Clerk's Office, which informed me that the appropriate vehicle in this situation is a motion to recall the mandate and for an extension of time. I apologize to the Court for the error.

(Rayfield's Decl. ¶¶ 5–6, *id.*, ECF No. 193–2.) Nonetheless, the Second Circuit denied Sainfil's motion to recall the mandate but granted Sainfil's motion for Rayfield to withdraw as counsel. (*Sainfil*, No. 20-778 (2d Cir.), ECF Nos. 207, 209.)

Even if Sainfil had not already filed a motion to recall the mandate, he has not demonstrated the prejudice necessary under *Strickland* to warrant relief in the form of a recall the mandate. Indeed, "the mandate may be recalled when a defendant acts with diligence and offers proof that his CJA counsel failed to provide assistance filing a *non-frivolous* petition for rehearing or rehearing *en banc* or failed to timely move to withdraw and inform the defendant of the opportunity to petition *pro se*." *Taylor*, 822 F.3d at 89. Even assuming arguendo that Rayfield's communication of an incorrect deadline could constitute a mistake that would satisfy the first prong of *Strickland*, Sainfil does not provide any support beyond his own conclusory speculations that had he filed a timely pro se petition for en banc rehearing, not only would it

---

[12] Rayfield's memorandum of law and motion to withdraw are also attached to Sainfil's reply brief in support of his Section 2255 Petition. (*See* ECF No. 329 at 19–22.)

have been granted but also the outcome of his appeal would have been different. The fact that the Second Circuit denied Sainfil's motion to recall the mandate (*Sainfil*, No. 20-778 (2d Cir.), ECF No. 207), and that the Supreme Court denied Sainfil's petition for a writ of certiorari, *see Sainfil*, 143 S.Ct. 1069 (2023), further suggests that the outcome likely would not have been any different had Sainfil timely filed a petition for rehearing en banc by the Second Circuit.

For all of these reasons, Sainfil fails to show that he suffered prejudice because of Rayfield's actions concerning Sainfil's request that his appeal be reheard en banc. Therefore, this claim fails to satisfy the *Strickland* test.

B. Claims of Ineffective Assistance of Trial Counsel

Sainfil further claims that Obedin, his trial counsel, was ineffective because: (1) he failed to challenge the admissibility of Sainfil's alleged statements to the FBI both before and after receiving *Miranda* warnings and improperly cross-examined Wonderland about the post-*Miranda* statements; (2) he conceded in his opening statement that Sainfil was located by the bank at the time of robbery; (3) he failed to object to the prosecution's leading questioning of the witnesses and improperly stipulated to the admission of the banking records in evidence; (4) he failed to investigate and prepare for trial; (5) he prevented Sainfil from testifying at trial; (6) he failed to challenge the admission of the surveillance video from outside the bank and to move for a mistrial after it was presented to the jury; and (7) he failed to timely provide the jury with the requested transcript and investigate why one of the jurors was crying after the verdict was announced. (Mem. Supp. at 11–12, 14–16, 18–23; Reply at 12–17.)

40

### a. *Trial counsel's failure to challenge the admissibility to Sainfil's statements to the FBI*

The ineffective assistance claim based on Obedin's failure to challenge the admissibility of Sainfil's pre-*Miranda* statements to the FBI is barred by the mandate rule because Sainfil raised this same claim on appeal, and the Second Circuit rejected it. *See Gahagen*, 44 F.4th at 108, 113; *see also Yick Man Mui*, 614 F.3d at 53 (setting out the mandate rule).

As to the post-*Miranda* statements, Sainfil's disagreement with Obedin's strategic choice of how to cross-examine a witness regarding the witness's testimony does not constitute a valid basis to find trial counsel ineffective. *See United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken."). Here, Obedin cross-examined Wonderland about the fact that his case notes did not contain any mention of Sainfil's post-*Miranda* statement. (Sentencing Tr. at 308:8–311:10.) Provided that there was no reasonable probability that the pre-*Miranda* statements would be excluded (as was later confirmed in Judge Hurley's decision on the Rule 33 motion), trial counsel's strategy of attempting to discredit the veracity of Wonderland's testimony was strategic and reasonable, and not objectively ineffective.[13] It is unlikely that trial counsel would have succeeded had he objected to Wonderland's testimony regarding Sainfil's post-*Miranda* statements as there was no reasonable basis for such an objection. Moreover, taking into account all other testimony and evidence

---

[13] At no point does Sainfil question the validity of his *Miranda* waiver or claim that the statements were made during an interrogation in violation of his *Miranda* rights.

41

presented by the government at trial, it is not likely that the exclusion of the post-*Miranda* statements could have yielded a different outcome.

### b. *Trial counsel's concession in the opening statement*

Sainfil's claim that Obedin was ineffective because he conceded in his opening statement that Sainfil was located outside the bank at the time of the robbery is also precluded by the mandate rule. *See* Mem. Supp. at 14–16; *Yick Man Mui*, 614 F.3d at 53. The Second Circuit held that Obedin's concession that Sainfil was located outside the bank "was a reasonable trial strategy to establish a forthright relationship with the jury, by conceding what the defense did not have evidence to contest." *Gahagen*, 44 F.4th at 108 (quoting *Bierenbaum*, 607 F.3d at 52).

### c. *Trial counsel's failure to object to leading questions and stipulation of evidence*

Sainfil's claims that Obedin was ineffective by failing to object to the government's use of leading questions when examining its witnesses and by stipulating to the admission of evidence do not satisfy either prong of *Strickland*. (*See* Mem. Supp. at 16–18.) "[D]ecisions such as when to object and on what grounds are primarily matters of 'trial strategy and tactics,' . . . and thus are 'virtually unchallengeable' absent exceptional grounds for doing so." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (citing *Brown v. Artuz,* 124 F.3d 73, 77 (2d Cir.1997)); *see also United States v. Donaldson*, 577 F. App'x 63, 67 (2d Cir. 2014) (rejecting an ineffectiveness claim concerning defense counsel's failure to object to leading questions posed by the government to its own witnesses). The same is true of decisions regarding a stipulation to the admissibility of exhibits. *Id.* Moreover, Sainfil also fails to demonstrate that he was prejudiced by these actions as he has not shown a reasonable probability that objections would have prevented the admission of the resulting testimony or evidence, much less that the

challenged testimony and evidence adversely influenced the outcome of his trial. *Cohen*, 427 F.3d at 171 ("[G]iven the plethora of evidence against [defendant], there is little reason to believe that alternative counsel would have fared any better.") (brackets in original); *Donaldson*, 577 F. App'x at 67 (reasoning that even if counsel had objected to leading questions, either the "district court would have permitted the question to be answered" or the government "would have rephrased the question").

### d.  *Trial counsel's preparation for trial*

Sainfil has failed to satisfy his burden of proving the prejudice prong of the *Strickland* test with respect to Obedin's alleged failure to prepare for trial and investigate because Sainfil makes only speculative and conclusory assertions in support of his claim. *See* Mem. Supp. at 22–23; *Strickland*, 466 U.S. at 697 (holding that a court need not address both prongs of Strickland where a petitioner makes an insufficient showing on one prong). It is true that counsel has a constitutional "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691. However, "[t]o successfully assert an ineffective assistance of counsel claim based on a failure to investigate, 'a petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation.'" *United States v. Peterson*, 896 F. Supp. 2d 305, 316 (S.D.N.Y. 2012) (internal citation omitted); *see also Dollison v. Nassau Cnty.*, No. 17-cv-2804, 2019 WL 3531522, at *9 (E.D.N.Y. Aug. 2, 2019) (requiring that a petitioner provide "sufficiently precise information, that is, a comprehensive showing as to what the investigation would have produced"). Moreover, "[t]ime and again, courts in the Second Circuit have held that where . . . a habeas petitioner fails to allege, let alone establish, how the result of his case would

have been different had any of his laundry list of shortcomings been corrected, there is no basis for finding that . . . any prejudice resulted from [the attorney's] actions." *Hernandez v. Artus*, No. 09-cv-05694, 2020 WL 2769404, at *11 (E.D.N.Y. May 28, 2020).

Sainfil offers a laundry list of ways in which Obedin's investigation and preparation were purportedly deficient. It includes that Obedin: (1) rested without putting on a defense; (2) only visited with Sainfil once or twice to prepare for trial; (3) failed to investigate potential witnesses who Sainfil said were "at the studio where the Government claims the robbery was planned" and could "testify to what goes on there"; (4) failed to hire a private investigator; (5) did not subpoena the phone company for location information regarding the phone number the government alleged belonged to Sainfil; (6) failed to cross-examine Wells regarding Sainfil's claim that he had not met Wells until Sainfil's first court date; (7) never asked Sainfil to produce any character witnesses; and (8) did not investigate allegations that one of Sainfil's co-conspirators was fired from the bank for stealing money. (*See* Mem. Supp. at 22–23.)

This Court does not consider whether Sainfil satisfies the first prong of *Strickland* with respect to these claims of inadequate investigation and trial preparation because Sainfil has not shown that any of these alleged deficiencies caused him prejudice.

It is true that Obedin's defense was brief. When the government rested on the second day of trial, Obedin requested to "not officially rest until [the following] morning" because "[t]here are a few things that [Sainfil] wants me to look at the rest of today before I rest." (Trial Tr. at 355:3–6.) The entirety of the defense presented the next morning covers only slightly more than three pages of testimony and consisted entirely of Obedin playing a composite video from the bank's surveillance system, which, Obedin argued, demonstrated that Sainfil was not depicted in

44

video recordings presented by the government. (Trial Tr. at 366–69.) But even assuming, "without deciding and without casting any aspersions on [Sainfil's] trial counsel," that this reflected deficient investigation and preparation for trial, *United States v. Valerio*, No. 14-cr-94, 2024 WL 2084052, at \*18 (E.D.N.Y. May 9, 2024), Sainfil has not precisely identified what evidence Obedin failed to present during the defense's case, other than the evidence he cites with respect to his other grounds for challenging Obedin's investigation and preparation for trail.

With respect to those other grounds, Sainfil fails to offer more than "vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation." *Peterson*, 896 F. Supp. 2d at 316. For example, Sainfil objects that Obedin did not investigate potential witnesses who were present at Homere's studio and who could serve as character witnesses, but he does not identify those witnesses, "demonstrate that the witnesses would have testified at trial[,] [or] explain the expected nature of the witnesses' testimony." *Id*. Likewise, he has not provided "sufficiently precise information" regarding what he would have told Obedin in additional attorney-client meetings, what location information from the phone company would have revealed, or how the testimony Obedin did not elicit would have impacted the outcome of the trial. *Dollison*, 2019 WL 3531522, at \*9. Similarly, although Sainfil objects that Obedin did not hire a private investigator, he "has not demonstrated a 'reasonable probability' that hiring a private investigator . . . would have exculpated or helped his case to the point of causing a different result." *Valerio*, 2024 WL 2084052, at \*18; *see also Alston v. United States*, No. 15 CR 435, 2021 WL 2380064, at \*7 (S.D.N.Y. June 10, 2021) (holding that an "effective defense does not necessarily require the services of a private investigator" because a private investigator may "[come] up with nothing useful"). The Second Circuit held on direct appeal that "as a factual

matter, there was abundant evidence putting Sainfil squarely at the scene of the robbery as a lookout." *Gahagen*, 44 F.4th at 109 (summarizing testimony from McCarthy, Wells, and Gahagen). Accordingly, none of Sainfil's claims of inadequate investigation and trial preparation demonstrate a "reasonable probability" that with further investigation and preparation Obedin would have uncovered evidence that would have sufficiently rebutted this testimony such that "the outcome of the proceeding would have been different." *Mayo*, 13 F.3d at 534.

> **e.** **_Trial counsel's failure to move for mistrial based on the admission of the surveillance video recording_**

The ineffective assistance claim based on Obedin's failure to move for mistrial based on the introduction of the surveillance video from outside the bank was previously rejected by Judge Hurley in the Order denying Sainfil's motions pursuant to Rules 29 and 33. (Oct. 2, 2019 Order.) As such, this claim is barred on this collateral review as Sainfil did not raise it on direct appeal or explain the prejudice he would suffer if the claim were not reviewed. *See Yick Man Mui,* 614 F.3d at 54. In any event, this claim is without merit because, as Judge Hurley explains in his decision on the motions under Rules 29 and 33, Sainfil did not suffer any prejudice from the admission of the video into evidence at trial. (Oct. 2, 2019 Order at 17.)

> **f.** **_Trial counsel's advice to Sainfil not to take the stand at trial_**

Sainfil's claim that Obedin was ineffective because he prevented Sainfil from testifying at trial is belied by the record and not supported by anything but Sainfil's present assertion that he would have testified. (*See* Mem. Supp. at 20.) Notably, Sainfil does not argue or explain how his testimony would have affected the result of the trial as required to show prejudice under *Strickland*. *See* 466 U.S. at 694. He only explains that he would have said that he did not know one of the co-conspirators—Wells—and that he would have explained that another co-

46

conspirator—McCarthy—had personal animosity towards Sainfil. (Mem. Supp. at 20; Reply at 14.) Given that there were other witnesses who testified about Sainfil's role in the preparation and execution of the robbery, and that Judge Wexler indicated that he would permit the government to cross-examine Sainfil about all of his prior bad acts (Trial Tr. at 357:14–16), it was not unreasonable that trial counsel advised Sainfil not to testify at trial. Furthermore, the record shows that when Judge Wexler asked Sainfil whether he would testify at trial, Sainfil unequivocally stated, "No." (*Id.* at 366:20–21.) Sainfil does not argue now that Obedin deprived him of exercising his right to testify at trial, but rather asserts that "counsel relentlessly argued [for Sainfil] not to" testify and ultimately persuaded him, as the record confirms, that it would be best for Sainfil not to take the stand. (Mem. Supp. at 20; Reply at 14.)

Sainfil's regret that he did not testify at trial does not demonstrate that trial counsel was ineffective in advising him to forego that strategy. Indeed, trial counsel made the strategic decision to advise his client to forego testifying in his own defense in light of the fact that Sainfil's testimony would expose him to potentially damaging cross-examination by the government. *See United States v. Young*, 654 F. App'x 32, 36 (2d Cir. 2016) (finding no ineffective assistance of counsel who "advised [the defendant] against testifying but never told him that he could not [testify]").

Moreover, given the evidence adduced at trial, including Sainfil's own words recited by FBI Agent Wonderland as well as the extensive testimony of his co-conspirators, it is unlikely that the trial result would have been different had Sainfil testified. *See Strickland*, 466 U.S. at 697; *see also Rega v. United States*, 263 F.3d 18, 20–21 (2d Cir. 2001) (finding error in the grant of habeas relief for ineffective assistance of counsel premised on counsel's failure to adequately

47

advise the defendant about his right to testify where there was no reasonable probability that the defendant's testimony would have affected the trial outcome); *United States v. Fleurimont*, 401 F. App'x 580, 583–84 (2d Cir. 2010) (rejecting claim of ineffective assistance of counsel where the defendant did not establish a reasonable probability that there would have been a reasonable doubt with respect to his guilt had he testified).

#### g.  *Trial counsel's failure to timely provide the jury with the trial transcript and investigate the crying juror*

Finally, Sainfil's claim that Obedin was ineffective for failing to timely provide the jury with testimony requested in a jury note and by not seeking to interview a juror who was crying after announcement of the verdict is not supported by the record. (*See* Mem. Supp. at 23–24.) There is no record of any jury note requesting any trial testimony. Nor is there a record or any indication of such communication being made, whether ex parte or not, with the trial court. With respect to the crying juror, after the verdict was delivered, the jury was polled and every juror voiced that "guilty" was their verdict. (Trial Tr. at 427–429.) There is no indication in the record that any of the jurors disagreed with the guilty verdict.

* * *

For all of the aforementioned reasons, Sainfil's ineffective assistance of trial counsel claims against Obedin fail.

### III.   Claims of Prosecutorial Misconduct

Sainfil claims that he was subjected to prosecutorial misconduct. (Mem. Supp. at 4–12; Reply at 2–12.) However, these claims are procedurally defaulted because he was required to raise such claims on direct appeal before raising them in a habeas petition under Section 2255.

48

Accordingly, absent a showing of either cause or prejudice, Sainfil's prosecutorial misconduct claims are not subject to collateral habeas review. *See Yick Man Mui*, 614 F.3d at 54.

A. Alleged *Brady* violation

First, Sainfil claims that the government committed a *Brady* violation when it allegedly withheld statements made by Homere, one of Sainfil's co-conspirators. (Mem. Supp. at 4–6.) This claim is procedurally precluded and, in any event, without merit.

Sainfil makes this argument for the first time in his habeas petition without having raised it on direct appeal. *See Gahagen*, 44 F.4th 99. Therefore, unless Sainfil has shown cause for such default and prejudice, this claim is procedurally defaulted. *See Yick Man Mui*, 614 F.3d at 54. Here Sainfil has failed to make either showing.

First, Sainfil has not demonstrated cause because he admits that he raised this issue with trial counsel, and he has not asserted that his trial counsel was ineffective in not raising a *Brady* claim. (Mem. Supp. at 5 (explaining that Sainfil was told that he was not entitled to the material and exculpatory statements made by Homere).)

Second, Sainfil has also failed to show prejudice, much less that he could prove a *Brady* violation, because he does not offer any reliable support for his allegation that Homere provided exculpatory evidence. The sole basis for Sainfil's argument is his assertion that, "two years post-trial, while incarcerated at MDC Brooklyn, [Sainfil] had a chance encounter with Mr. Homere," who allegedly informed Sainfil that he "told the government that [Sainfil] wasn't involved in the robbery but didn't get into specifics." (Mem. Supp. at 4.) Such a general and unsupported account of the alleged conversation is insufficient to demonstrate that the government committed a *Brady* violation. *See Gonzalez v. United States,* 722 F.3d 118, 131 (2d Cir. 2013)

("[P]resentation of conclusory allegations unsupported by specifics is subject to summary dismissal."); *see also Haouari v. United States*, 510 F.3d 350, 354 (2d Cir. 2007) (noting that "[a]iry generalities, conclusory assertions and hearsay statements will not suffice" to even warrant a hearing on a Section 2255 petition) (internal quotation marks and citations omitted). Moreover, the government, in its opposition brief, denies that it possessed any exculpatory evidence that it did not turn over to Sainfil. (Mem. Opp'n at 13.) Furthermore, Homere was not one of the witnesses called at trial. (*cf* Trial Tr.) Accordingly, because the government maintains that Homere did not make any exculpatory statements, Sainfil was not entitled to receive Homere's statements pursuant to 18 U.S.C. § 3500. (*Id.*)

B.  Failure to Disclose Post-*Miranda* Statement

Next, Sainfil claims that the government committed misconduct by failing to disclose to him the existence of his post-*Miranda* statement to which FBI Agent Wonderland testified at trial. (Mem. Supp. at 6–7; Reply at 5–6.) This claim, like Sainfil's *Brady* claim, is procedurally defaulted because Sainfil failed to raise it on direct appeal from his conviction and sentence. While Sainfil attempts to argue that the cause for his default is the ineffective assistance of his appellate counsel, he does not explain how his appellate counsel was ineffective besides simply stating that counsel did not argue this issue on appeal. (Reply at 5.) He also attempts to claim "actual innocence" without providing any evidence (*id.*), which also was not advanced on appeal.

Even assuming that such failures could be deemed a valid cause for procedural default, Sainfil cannot show prejudice resulting from the non-review. The Second Circuit affirmed the admission of the pre-*Miranda* statement and found no reasonable probability that the outcome of the trial would have been different had that statement been suppressed. *See Gahagen*, 44 F.4th at

107–08. Even if the post-*Miranda* statement were excluded, there is ample evidence for the jury to have found that Sainfil was outside of the bank during the armed bank robbery, including testimony from three witnesses. (*See e.g.*, Trial Tr. at 253–54.).

C. Misstating Evidence and Use of Leading Questions

Further, Sainfil claims that there was prosecutorial misconduct when the government allegedly misled the jury by misstating the evidence in its summation and by improperly using leading questions when examining the government's witnesses. As with his other claims of prosecutorial misconduct, none of these arguments were raised on direct appeal, and Sainfil does not provide cause or show prejudice as required to overcome such procedural default. Therefore, these claims are procedurally barred.

Furthermore, based on review of the trial transcripts, none of these claims appear to have merit. While the government indeed used leading questions when examining its own witnesses, trial counsel did not object, and the trial court did not prevent the government from doing so. Additionally, review of the government's opening statement and summation does not support Sainfil's argument that they were so misleading or improper as to warrant habeas relief. (Trial Tr. at 9–15, 369–379.)

Therefore, Sainfil's claims of prosecutorial misconduct are all procedurally barred on collateral habeas review. *See Linnick v. United States*, No. 13-cr-120, 2022 WL 17065998, at *7 (E.D.N.Y. Nov. 16, 2022) (finding that the claims of prosecutorial misconduct raised for the first time in a Section 2255 petition were procedurally precluded and barred from review where the petitioner could not establish either cause or prejudice). In any event, these claims are not supported by anything beyond Sainfil's conclusory and speculative assertions.

## IV.   Evidentiary Hearing

Finally, Sainfil requests an evidentiary hearing on his claims. However, "the filing of a motion pursuant to Section 2255 does not automatically entitle the movant to a hearing; that statutory provision does not imply that there must be a hearing where the allegations are 'vague, conclusory, or palpably incredible.'" *Gonzalez*, 722 F.3d at 130 (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). A hearing is necessary only where the petition "set[s] forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the movant] to relief." *Id*. at 131.

Even if some type of hearing is warranted, it is "within the district court's discretion to determine the scope and nature of a hearing." *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011) (citing *Chang* 250 F.3d at 85–86). Courts often "consider the 'trial record, letters, documents, exhibits, affidavits and written interrogatories' and may adopt a 'middle road' approach, declining to hold a hearing and 'deciding disputed facts on the basis of written submissions.'" *Rosario v. United States*, 2019 WL 5260784, at *3 (S.D.N.Y. Oct. 17, 2019) (quoting *Pham*, 317 F.3d at 184).

Here, none of Sainfil's habeas claims warrant a full evidentiary hearing. As addressed, all claims related to his allegations of prosecutorial misconduct are procedurally barred, and all but one of his ineffective assistance of counsel claims are either procedurally precluded and/or meritless. Accordingly, the Court denies these claims without a hearing as "the motion and the files and the records of the case conclusively show that [Sainfil] is entitled to no relief" on those claims. 28 U.S.C. § 2255(b). With respect to the claim of ineffective assistance of appellate counsel, this Court exercised discretion and ordered Rayfield to respond to the claim. (July 25,

52

2024 Order.) Rayfield did so by filing an affirmation on September 25, 2024. (Rayfield's Aff.) This Court duly considered Rayfield's response in resolving the Petition's claims of ineffective assistance of appellate counsel in this Opinion and Order. Therefore, there is no need for an evidentiary hearing on any of the claims raised in the Petition.

**REMEDY**

Sainfil has shown that his sentence is "subject to collateral attack," 28 U.S.C. § 2255 because his appellate counsel was ineffective for failing to raise on appeal the district court's erroneous application of the U.S.S.G. § 3C1.2 two-level enhancement without making the required factual findings when calculating the advisory Sentencing Guideline range. The Court must now determine the appropriate remedy for this constitutional violation.

"Section 2255 grants district courts the discretion to choose among four remedies when reviewing a sentence that was not authorized by law or is otherwise open to collateral attack." *United States v. Pena*, 58 F.4th 613, 618 (2d Cir. 2023). "A court may: [1] vacate and set the judgment aside and . . . discharge the prisoner or [2] resentence him or [3] grant a new trial or [4] correct the sentence as may appear appropriate." *Id.* Moreover, "[b]ecause the Sixth Amendment provides criminal defendants with the right to *effective* assistance of counsel . . . inadequate representation is a basis for relief under section 2255." *Morales v. United States*, 635 F.3d 39, 42–43 (2d Cir. 2011) (emphasis in original).

Had Rayfield provided effective assistance of appellate counsel and raised on appeal the district court's error in applying the two-level U.S.S.G. § 3C1.2 enhancement, Sainfil could have secured resentencing as a remedy from the Second Circuit. "Where, as here, the district court

53

failed to make a finding of fact necessary to apply an enhancement under the Guidelines," the appeals court will "vacate the sentence and remand the case for further proceedings." *United States v. Reed*, 541 F. App'x 112, 113 (2d Cir. 2013) (citing *United States v. Scotti,* 47 F.3d 1237, 1251–52 (2d Cir. 1995)). Resentencing is also the proper remedy here, where Sainfil's 135-month prison sentence on the armed bank robbery count was affirmed on appeal without the benefit of any appellate challenge to the district court's application of the two-level reckless endangerment sentencing enhancement and there is a reasonable probability that the Second Circuit would have reversed the application of that enhancement, which would have led to a lower advisory Sentencing Guideline range and the imposition of a different sentence on the armed bank robbery count.

Accordingly, the appropriate remedy for Sainfil's successful ineffective assistance of appellate counsel claim concerning the district court's erroneous application of U.S.S.G. § 3C1.2 is to grant Sainfil resentencing.

### CONCLUSION

For the reasons stated above, Sainfil's Petition for a writ of habeas corpus under 28 U.S.C. § 2255 is granted in part and denied in part. Sainfil's claim that his appellate counsel was ineffective for failing to argue to the Second Circuit that the sentencing court erred in applying the U.S.S.G. § 3C1.2 two-level reckless endangerment enhancement when calculating the advisory Sentencing Guidelines range is granted.

Accordingly, the case is remanded for resentencing not inconsistent with this Opinion and Order. The Court also appoints counsel to represent Sainfil for the purposes of the resentencing hearing.

Sainfil's remaining claims are denied.

Dated: Central Islip, New York
May 27, 2026

_/s/ Nusrat J. Choudhury_
NUSRAT J. CHOUDHURY
United States District Judge
